B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) 18-01433 EEB |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| James M. Rallo | Randy Barrientez |

| ATTORNEYS (Firm Name, Address, and Telephone No.) The Klug Law Firm, LLC/Noah Klug, #39163 PO Box 6683, Breckenridge CO 80424 970-468-4953 | ATTORNEYS (If Known) Shilliday Law, P.C./Robert J. Shilliday, #35595 1888 Sherman St., Ste. 760, Denver CO 80203 720-439-2500 |

| PARTY (Check One Box Only) ☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin ☑ Creditor   ☐ Other ☐ Trustee | PARTY (Check One Box Only) ☑ Debtor   ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor   ☐ Other ☐ Trustee |

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Complaint under 11 U.S.C. 523(a)(4) to except debt owed by Debtor to Plaintiff from bankruptcy discharge. Core proceeding under 28 U.S.C. 157(b)(2). Jurisdiction under 18 U.S.C. 1334 and 11 U.S.C. 523(a)(4).

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☑ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ at least 951,535.91 |

Other Relief Sought

Punitive damages, pre- and post-judgment interest, costs and attorney's fees

FILED
KENNETH S. GARDNER, CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO
2018 DEC 28 P 1:10

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Randy Barrientez | BANKRUPTCY CASE NO.<br>18-18706-EEB | |
| DISTRICT IN WHICH CASE IS PENDING<br>Colorado | DIVISION OFFICE | NAME OF JUDGE<br>Blackburn |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>12/28/18 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>NOAH KLUG, 39163 | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No.: 18-18706-EEB |
| **RANDY BARRIENTEZ** | ) | |
| SSN: xxx-xx-6539, | ) | Chapter 7   18 - 0 1 4 3 3   EEB |
| | ) | |
| Debtor. | ) | Adversary No._____ |
| | ) | |
| **JAMES M. RALLO,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| versus | ) | |
| | ) | |
| **RANDY BARRIENTEZ,** | ) | |
| Debtor. | ) | |

**COMPLAINT UNDER 11 U.S.C.A. § 523(a)(4) TO EXCEPT DEBT OWED BY DEBTOR
TO PLAINTIFF FROM DISCHARGE**

**I.    Jurisdiction.**

1.  This civil/adversary proceeding is brought under Bankruptcy Rules and arises in
    connection with or is related to a proceeding under Chapter 7 of the Bankruptcy Code
    styled *In re Barrientez*, Case No. 18-18706-EEB, pending in the United States
    Bankruptcy Court for the District of Colorado.

2.  Jurisdiction over this civil/adversary proceeding lies under 28 U.S.C.A. § 1334, and
    under 11 U.S.C.A. § 523(a)(4).

**II.    Core Proceeding.**

3.  This matter is a core proceeding as defined by 28 U.S.C.A. § 157(b)(2), and should be
    referred to the Bankruptcy Court. The Plaintiff consents to entry by the bankruptcy judge
    of a final order or judgment in this matter, provided, however, that the final award of
    costs and attorney's fees should be determined by the trial court in the State Lawsuit as
    described below.

**III.    Parties.**

4.  Plaintiff is a resident of Maryland and is the sole owner of certain real property legally
    described as Lot 7, First Amended Plat, Trappers Glen Subdivision Filings 1, 2 and 3,
    according to the plat filed March 19, 1996, at Reception No. 517871, Summit County,

Page 1

Colorado, and commonly known as 1030 Four O'Clock Road, Breckenridge, Colorado (the "Property").

5. Debtor, Randy J. Barrientez, was a general contractor who did business through RJB Development, Inc., a Colorado corporation ("RJB").

6. On October 4, 2018, Debtor sought relief under Chapter 7 of the Bankruptcy Code. No order of discharge has been entered in Debtor's case as of the date of the filing of this Complaint.

## IV.   Statement of Facts of Case.

7. Plaintiff asserts a debt in the amount of at least $951,535.91 representing damages, prejudgment interest, costs and attorney's fees incurred by Plaintiff as a consequence of a fraud and defalcation perpetrated by Debtor upon Plaintiff.

8. On or about August 9, 2013, Plaintiff and RJB entered into a construction agreement whereby RJB would act as a general contractor to construct a single-family family home on the Property (the "Project"). The terms of that agreement are set out in that certain Construction Contract between Owner and Contractor (Cost Plus with a Guaranteed Maximum Price) dated August 9, 2013 (the "Contract"), a true and accurate copy of which is attached to this Complaint as **Exhibit 1** and incorporated herein by reference.

9. Plaintiff's ex-wife, Kimberly P. Rallo, was also a signatory of the Contract and an interest in the Property, but she transferred all rights and responsibilities concerning the same to Plaintiff by virtue of their separation agreement and he now solely possesses same.

10. Debtor was also a signatory of the Contract and personally guaranteed performance thereof according to its terms.

11. Work began on the project in mid-July 2013 and construction continued through winter of 2013-2014.

12. From August 23, 2013, to November 20, 2014, RJB submitted fourteen payment requests (draws) to Plaintiff. These payment requests included twelve change orders. Plaintiff paid the fourteen payment requests, including the change orders, in full.

13. RJB submitted a fifteenth payment request to Plaintiff on December 23, 2014, one day after issuance of the certificate of occupancy for the Project. Plaintiff paid a portion of RJB's fifteenth payment request and withheld a portion based on delay in completion and deficiencies in construction.

14. In total, Plaintiff paid $1,994,384.16 against RJB's first fifteen payment requests toward the Project. (RJB submitted additional payment requests and change orders to Plaintiff that were not paid and which Plaintiff had no obligation to pay as later determined by the trial court.)

15. C.R.S. § 38-22-127, commonly known as the "Trust Fund Statute," creates a trust obligation that may be enforced by the property owner with respect to funds disbursed to a contractor on a construction project. A contractor generally breaches the statutory trust relationship by diverting trust funds from the suppliers and laborers on a project to other obligations. In addition, the Trust Fund Statute imposes an accounting obligation on a contractor to whom payments are made. When funds are earmarked, the Trust Fund Statute requires a contractor to pay them as earmarked. A corporate officer is personally responsible for the knowing diversion of funds under the Trust Fund Statute. Any person who violates the obligations of trust and accounting provided in the Trust Fund Statute commits theft as defined in C.R.S. § 18-4-401. Pursuant to C.R.S. § 18-4-405, an aggrieved owner is entitled to recover damages in the amount of three times the amount of actual damages, together with attorney's fees and costs for any such theft.

16. By virtue of the Trust Fund Statute and the Contract, Debtor through RJB acted as a trustee and fiduciary for funds paid by Plaintiff toward the Project as and when received. Through this fiduciary relationship, Plaintiff placed confidence, trust and good faith in Debtor's legal duties owed to him.

17. Debtor was the president of RJB, he negotiated and personally guaranteed the Contract, and he had knowledge and responsibility, in concert with his son, Marand Barrientez, of all financial and other business decisions made by RJB throughout the course of the Project.

18. Notwithstanding his fiduciary obligations to Plaintiff, Debtor intentionally or recklessly caused and directed RJB to use trust funds to pay itself in preference to subcontractors and/or material suppliers causing actual damages to Plaintiff in the amount of $30,061.58.

19. Notwithstanding his fiduciary obligations to Plaintiff, Debtor intentionally or recklessly caused and directed RJB to fail to pay trust funds as they were earmarked according to the draws for the Project leaving subcontractors and suppliers unpaid and causing actual damages to Plaintiff in the amount of $31,071.89.

20. Notwithstanding his fiduciary obligations to Plaintiff, Debtor intentionally or recklessly caused and directed RJB to fail to properly account for $137,862.62 in trust funds disbursed by Plaintiff causing actual damages to Plaintiff in the amount of $137,862.62.

21. The combined total of said actual damages equals $198,996.09.

22. Debtor breached his duties under his fiduciary relationship with Plaintiff, violated multiple provisions of the Trust Fund Statute, committed civil theft, and converted Plaintiff's funds disbursed toward the Project.

23. Pursuant to C.R.S. § 18-4-405, Plaintiff is entitled to an award of damages in an amount equal to three times his actual damages for civil theft, for a total of $596,988.27, together with his reasonable attorney's fees and costs.

24. Plaintiff is also entitled to prejudgment interest in the amount of $161,426.46 pursuant to C.R.S. 13-21-101(1).

25. On December 22, 2014, Plaintiff filed an initial complaint against RJB and Debtor in state court in an action styled *Rallo v. RJB Development Inc. et al*, Case No. 14CV30297, District Court, Summit County, Colorado (the "State Lawsuit").

26. On March 3, 2015, Plaintiff filed an amended complaint in the State Lawsuit that, among other things, included claims against RJB and Debtor for violation of the Trust Fund Statute and conversion.

27. A trial to the court was held in the State Lawsuit on January 18-20, March 20-22, and April 26, 2017.

28. Before Debtor sought relief under the Bankruptcy Code, the trial court in the State Lawsuit entered judgment against RJB and Debtor personally on all claims, including violation of the Trust Fund Statute and conversion. The trial court later amended the judgment to correct certain clerical errors and award prejudgment interest in a definite amount. True and accurate copies of the original judgment and amendment thereto (jointly, the "Judgment"), are attached to this Complaint as **Exhibit 2** and incorporated herein by reference.

29. The factual findings in the Judgment are true and accurate in all respects. The damages and prejudgment interest alleged above are specifically itemized and substantiated in the Judgment.

30. Subsequent to the Judgment, Plaintiff filed an affidavit of attorney's fees and bill of costs in the State Lawsuit wherein he requested $7,946.18 in costs and $185,175 in fees as of July 5, 2018, for a total of $193,121.18. A true and accurate copy of the request is attached as **Exhibit 3**. The trial court in the State Lawsuit has not yet determined the final award of costs and fees and there is pending in the Bankruptcy Court a stipulated motion for relief from the automatic stay to allow the trial court to do so (Doc. 21). Debtor has agreed to stipulate to this relief.

31. Through his control of RJB, Debtor has caused RJB to breach the fiduciary duties it owed to Plaintiff.

32. Through his control of RJB, Debtor has used RJB as a conduit to defraud Plaintiff and to commit defalcation by misappropriating money and property held in trust for Plaintiff's benefit.

33. Debtor acted at all times with wrongful intent and conscious disregard of his fiduciary duties to Plaintiff.

34. Plaintiff has been injured by Defendant's fraud and defalcation in the amount of at least $951,535.91, together with all attorney's fees and costs incurred and to be incurred in this

adversary proceeding.

35. Defendant's fraud and defalcation was malicious, willful and wanton, entitling Plaintiff to recover punitive damages in an amount equal to his actual damages according to C.R.S. § 13-21-102(1)(a).

36. Defendant's debt to Plaintiff in an amount equaling at least $951,535.91 is nondischargeable as incurred by fraud and defalcation committed by a fiduciary under 11 U.S.C.A. § 523(a)(4).

WHEREFORE, Plaintiff requests that judgment be entered against Defendant:

A. In the amount of $758,414.73 as actual damages, statutory damages and prejudgment interest;

B. For such attorney's fees and costs as Plaintiff may show himself entitled (which Plaintiff requests that the trial court be allowed to determine in the State Lawsuit with respect to that action);

C. For such punitive damages as the Court may award;

D. For postjudgment interest; and

E. That all amounts awarded to Plaintiff be found to be nondischargeable under 11 U.S.C.A. § 523(a)(4).

Respectfully submitted this 28th day of December, 2018.

THE KLUG LAW FIRM, LLC
BY: /s/ Noah Klug
Noah Klug, Atty. Reg. No. 39163
Counsel to James M. Rallo
PO Box 6683
Breckenridge CO 80424
Tel: 970-468-4953, Facsimile: 800-675-1349
E-mail: noah@thekluglawfirm.com

**EXHIBIT**

**1**

# CONSTRUCTION CONTRACT

## BETWEEN OWNER AND CONTRACTOR
## (COST PLUS WITH A GUARANTEED MAXIMUM PRICE)

This Contract is made on August 9, 2013



**RJB**

**DEVELOPMENT**

### between the OWNER

| | |
|---|---|
| *NAME:* | *PHONE:* |
| | (202) 558-6207 |
| Jim and Kimberly Rallo | (443) 255-4541 |
| *EMAIL:* | *FAX:* |
| Jim.rallo@Liquidityservicesinc.com | (202) 467-5881 |
| *ADDRESS:* | |
| 10104 Flower Gate Terrace | |
| Potomac, MD.  20854 | |

### and the CONTRACTOR

| | |
|---|---|
| *NAME:* | *PHONE:* |
| RJB Development Inc. | (970) 513-0777 |
| *EMAIL:* | *FAX:* |
| info@rjbdevelopment.com | (970) 513-0770 |
| *ADDRESS:* | |
| PO Box 25720 | |
| Silverthorne, CO 80497 | |

### for construction of the Project

| | |
|---|---|
| *LOT:* | *ADDRESS:* |
| Lot 07, Trappers Glen | 1030 Four-OClock-Road |
| Breckenridge, CO 80424 | Breckenridge CO 80424 |

### the Architect for the Project is

| | |
|---|---|
| *NAME:* | *PHONE:* |
| BHH Partners | (970) 453-6880 |
| *EMAIL:* | *FAX:* |
| mhogan@bhhpartners.com | (970) 453-6888 |
| *ADDRESS:* | |
| PO Box 921, 60 East Adams Avenue, Breckenridge CO 80424 | |

Page 1 of 13

The OWNER and CONTRACTOR agree as follows.

## ARTICLE 01    CONTRACT DOCUMENTS
The Contract Documents consist of:
1. this Contract and any attachments hereto;
2. any Change Orders issued after execution of this Contract; and
3. Architectural plans for the Project Dated 5/24/2013 and as amended
4. Structural plans Dated 5/23/2013 and as amended
5. The Soils Report from Gore Range Engineering Services Dated 7/26/2013 and as amended
6. General Contractor schedule Dated 06/20/2013
7. Cost Control Estimate Dated 08/09/2013

The OWNER and CONTRACTOR hereby certify that they have read and familiarized themselves with the Contract Documents and are aware of all terms, provisions and conditions contained therein.
These documents form the Contract, and are incorporated herein.  The Contract represents the entire agreement between OWNER and CONTRACTOR.  .

The Contract may be amended or modified by a written Change Order.  The Contract Documents shall not be construed to create a contractual relationship of any kind (a) between the Architect and the CONTRACTOR, (b) between the OWNER and any Subcontractor, or (c) between any persons other than OWNER and CONTRACTOR.

## ARTICLE 02    CONTRACT WORK
CONTRACTOR shall supply and furnish all labor, materials, tools, supplies, equipment, machinery, transportation, supervision, insurance, taxes, services and other items required to complete and shall complete the following Work:
Construction    of    new    residential    dwelling    at    1030    Four-O'clock-Road    in    Breckenridge    CO.

## ARTICLE 03    CONTRACT TIME
CONTRACTOR'S Work shall commence on or before
7/15/2013 Excavation
Provided full building permit is obtained.

CONTRACTOR'S Work shall be substantially completed by
May 15th 2014.

"Substantial Completion" shall be defined as the stage in the progress of the work when the work is sufficiently complete so that the OWNER can legally occupy or use the Residence.

Time is of the essence of this Contract.  If the Commencement Date for CONTRACTOR'S Work is delayed through no act or fault of CONTRACTOR, the Substantial Completion Date shall be extended by the same number of days as the delay.

If CONTRACTOR'S Work is delayed by any change in the Work, by labor dispute, fire, unusual delay in delivery, adverse weather conditions, unavoidable casualty delays incurred due to the failure of OWNER to make timely decisions under the contract or any other cause beyond CONTRACTOR'S control, the Contract Time shall be extended by Change Order in accordance with Article 5.  In the case of a continuing cause of delay only one claim is necessary.

Contractor shall receive a $10,000 bonus payment if the Certificate of Occupancy (CO) is obtained and Substantial Completion is achieved by March 15, 2014.

Page 2 of 13

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

Contractor shall Pay Owner in the form of a credit to the next scheduled draw $10,000 for each 30 day period after May 15th, 2014.

## ARTICLE 04   CONTRACT SUM

OWNER shall pay CONTRACTOR the Contract Sum of the Cost of the Work plus 4% percent of the Cost of the Work (CONTRACTOR'S Fee), but not to collectively exceed a maximum price of **$2,127,520** (Guaranteed Maximum Price which includes $467,707. of allowance items), subject to additions and deductions as provided in this Agreement. The Guaranteed Maximum Price to calculate any savings to be split between the Owner and the Contractor would thus be the $2,127,520 less allowances of $ 467,707 or $1,659,813.

In the event that the final and total Cost of the Work, less Allowance Items(meaning that allowance items are the sole risk of the Owner, such that if allowance items cost more, then the Owner pays all of that amount, if the allowance items cost less than the Owner keeps all of the savings, is less than the Guaranteed Maximum Price as set forth above, or as modified by written change orders, then Owner and Contractor shall share in the Cost savings in the following proportions: Owner (50%) - Contractor (50%). By way of example, if the total Cost of the Work is $1,000.00 less than the Guaranteed Maximum Price, then Contractor shall receive a bonus of $500.00. Any bonuses to which Contractor might be entitled hereunder shall be paid as part of the Final Payment

### A.     COST OF THE WORK

Cost of the Work means costs necessarily incurred by CONTRACTOR in the proper performance of the Work.  Cost of the Work shall include only the items set forth below:

1. Costs, including transportation, of materials and equipment incorporated or to be incorporated in the Project.  Any trade discounts CONTRACTOR receives from its suppliers will be passed on to OWNER.

2. Payments made by CONTRACTOR to Subcontractors in accordance with the requirements of the Subcontracts.

3. Cost of all materials, temporary facilities, equipment and hand tools not customarily owned by the construction workers, which are provided by CONTRACTOR and fully consumed in the performance of the Work.

4. Reasonable rental costs for necessary temporary facilities, machinery, equipment and hand tools used at the site of the Work, whether rented from CONTRACTOR or others.

5. Costs of removal of trash and debris from the site.

6. That portion of the reasonable travel and subsistence expenses of the CONTRACTOR'S personnel incurred while traveling in discharge of duties connected with the Work if preapproved by Owner.

7. Costs of materials and equipment stored off-site at a mutually acceptable location, if approved in advance by the OWNER.

8. Sales, use or similar taxes related to the Work.

9. Fees of laboratories for tests required by the Contract Documents, except those related to defective or nonconforming Work or other provisions of the Contract Documents

Page 3 of 13

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

10. Fees for the building permit, property OWNERS' association review and approval, and for other permits, licenses and inspections CONTRACTOR is required by the Contract Documents to pay. No CONTRACTOR'S Fee will be charged for items listed in this paragraph.

11. Costs of reproducing plans sets for bidding and subcontracting purposes as necessary, including CONTRACTOR'S time to pickup and prepare.

12. Preparation of Subcontract Agreements and Change Orders; preparation of shop drawings; the specification, selection, and purchasing of materials; and preparation of construction schedules.

13. Costs of CONTRACTOR'S general liability and/or builders risk insurance directly related to the Project.

14. Costs to protect work in place.

15. Costs due to emergencies incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property.

16. Costs of repairing or correcting damaged or nonconforming Work executed by CONTRACTOR, Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of CONTRACTOR and only to the extent that the cost of repair or correction is not recovered by CONTRACTOR from insurance, sureties, Subcontractors or suppliers.

17. Legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the OWNER and CONTRACTOR, reasonably incurred by the CONTRACTOR in performance of the Work if pre-approved by the OWNER.   No CONTRACTOR'S Fee will be charged for items listed in this paragraph.

18. Expenses incurred in accordance with the CONTRACTOR'S standard personnel policy for relocation and temporary living allowances of personnel required for the Work, if approved by the OWNER.

19. Costs incurred in performance of the Work if and to the extent approved in advance in writing by OWNER.

20. Wages of employees of CONTRACTOR to perform construction of the Work, including time spent picking up materials and mobilizing job and labor burden (i.e. unemployment compensation, social security and other benefits). CONTRACTOR'S Rate Schedule by role:

| | | |
|---|---|---|
| a) Principal | $ 95.00 |
| b) Project Manager | $ 85.00 |
| c) Carpenter | $ 35.00 |
| d) Office Manager | $ 35.00 |
| e) Laborer | $ 19.00 |

B.   **COSTS NOT TO BE REIMBURSED**
Cost of the Work shall not include:

1. Expenses of CONTRACTOR'S principal office or other offices.

2. Overhead and general expenses, including state and federal taxes.

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

3. CONTRACTOR'S capital expenses, including interest on CONTRACTOR'S capital employed for the Work.

4. Rental costs of machinery and equipment, except as specifically provided in Subsection 4.A.5 above.

5. Costs to purchase, repair, and maintain CONTRACTOR'S tools, vehicles, and equipment, but excluding consumables (e.g. saw blades and other small tools consumed during the progress of the Work).

6. Cellular phone charges (unless specifically agreed to in writing by OWNER and CONTRACTOR).

7. Costs due to the fault or negligence of CONTRACTOR, Subcontractors, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including, but not limited to, costs for the correction of damaged, defective or non-conforming work, disposal of or replacement of materials and equipment incorrectly ordered or supplied, and make good damaged property not forming part of the Work.

8. Any cost not specifically and expressly described in Section 4.A above.

9. Costs which would cause the Guaranteed Maximum Price described below to be exceeded.

**C.    COST CONTROL AND TRACKING**

The CONTRACTOR shall prepare and submit to the OWNER, in writing, a Cost Control Estimate in the amount of $2,127,520. The Cost Control Estimate shall include the Cost of the Work plus the CONTRACTOR Fees. The Cost Control Estimate is a Guaranteed Maximum Price so that the sum of the Cost of Work and Contractor's Fee shall not exceed $2,127,520 subject to additions and deductions by change orders.

The CONTRACTOR shall also implement a detailed system of cost control that will provide the OWNER with information as to the anticipated total Cost of the Work. The cost control system shall compare the Cost Control Estimate with the actual cost for activities in progress, estimates for uncompleted tasks and changes to the scope of work. This information shall be reported to the OWNER, and revised at mutually agreed-upon intervals.

In the event that the OWNER discovers any inconsistencies or inaccuracies in the information presented, they shall promptly notify the CONTRACTOR, who shall make appropriate adjustments.

The OWNER acknowledges that there are factors that could increase Guaranteed Maximum Price, including, but not limited to, changes in the work as described in Article 5 and the following:

1. Providing any excavation or site preparation work, such as slopes stability testing, beyond what may be expected based on the Construction Documents and any soils test reports or similar items.

2. Making revisions in drawings, specification and other documents when the revisions become necessary as a result of changes in codes, laws, or regulations after effective date.

3. Providing any services in connections with a public hearing.

4. Providing any services to fulfill requirements of a government agency relating to obtaining a building or other permit that are beyond what may be expected based on previous experience.

**CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP**

5.   Providing any services for coordinating construction performed by OWNER'S own CONTRACTORs.

All accounting work and documentation preparation in connection with Draws is an Overhead cost and is included in the CONTRACTOR'S Fee.

The CONTRACTOR shall provide the OWNER with one (1) draw request as needed to keep the project on schedule. Each line item of the draw request shall clearly specify the associated address and cost to which the item applies.

## ARTICLE 05    CHANGES IN THE WORK

CONTRACTOR may be ordered by written Change Order, signed by OWNER and CONTRACTOR, to make changes in the Work within the scope of this Contract consisting of additions, deletions or other revisions, the Contract Sum, including CONTRACTOR'S Fee, and Contract Time being adjusted accordingly.

CONTRACTOR shall additionally be entitled to an adjustment in the Contract Sum, including CONTRACTOR'S Fee, Supervision Fee and Contract Time as a result of deficiencies in the Plans and Specifications; or subsurface or concealed physical conditions materially different from those indicated in the Contract Documents or unknown significant physical conditions of an unusual material nature encountered at the project, such as a 20 ton boulder. OWNER EXPRESSLY ACKNOWLEDGES THAT, IN ADDITION TO ANY OTHER CHANGE ORDERS DESCRIBED IN THIS ARTICLE, ANY AND ALL COSTS EXCEEDING ANY ALLOWANCE ITEM SET FOR IN THE **ATTACHED COST CONTROL ESTIMATE** WILL RESULT IN A CHANGE ORDER INCREASING THE GUARANTEED MAXIMUM PRICE OF THIS CONTRACT BY THE AMOUNT ABOVE THE LINE ITEM ALLOWANCE.

CONTRACTOR shall make all claims to OWNER for additional cost, extensions of time and damages for delays or other causes at the time such claims are identified and in accordance with the Contract Documents.

## ARTICLE 06    OWNER RESPONSIBILITIES

OWNER shall provide CONTRACTOR with proof of sufficient financing, in the amount of the Contract Sum, prior to the start of CONTRACTOR'S Work. OWNER shall also take whatever steps are necessary to secure financing or make funds available for the completion of the work.

OWNER shall cooperate with CONTRACTOR and perform its obligations under the Contract in a timely manner and so as not to delay or interfere with CONTRACTOR'S performance of its obligations under the Contract. OWNER shall provide timely review and approvals of submissions by CONTRACTOR.

OWNER acknowledges that control, direction and supervision of all construction personnel rests exclusively with CONTRACTOR. OWNER shall not issue any instructions to, or otherwise interfere with, construction personnel. OWNER will not contract with any of CONTRACTOR'S subcontractors or material suppliers to provide materials or perform work in or about the Project until CONTRACTOR'S Work is complete. OWNER will indemnify, defend and hold harmless CONTRACTOR, its CONTRACTORs, subcontractors, employees and agents against any claims, demands, loss, damages, liability or other expense they may incur by reason of OWNER'S breach of this provision.

OWNER acknowledges that construction is a business with inherent dangers and that any visit to the construction site by the OWNER or the OWNER'S agents, whether during or outside of normal working hours, will be at the OWNER'S sole risk. OWNER agrees to hold the CONTRACTOR harmless and indemnify the CONTRACTOR against all injury, loss, damages, fines (including any assessed by OSHA), costs and expenses, including reasonable attorney fees and costs, arising from OWNER'S or OWNER'S agents entry onto or inspection of the Property during construction.

Page 6 of 13

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

OWNER shall provide, at its own cost and expense, and all of which CONTRACTOR is entitled to rely on in performing its Work: plans and specifications; surveys except Site Improvement Location Certificate; geotechnical studies; easements, zoning and other encumbrances affecting land; legal description of the Property; and environmental reports.

OWNER shall cooperate with the CONTRACTOR in securing permits, licenses and inspections.

OWNER is responsible for all work performed by the Architect and other CONTRACTORs to OWNER. OWNER shall require all other CONTRACTORs to cooperate with CONTRACTOR so as not to interfere with CONTRACTOR'S Work.

OWNER shall indemnify and hold harmless the CONTRACTOR from and against all claims, damages, losses and expenses arising out of or resulting from the performance of the Work subsequent to the date of this Agreement, provided that any such claim, damage, loss or expense (i) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property including the loss of use resulting therefrom, and (ii) is caused in whole or in part by any negligent act or omission of the OWNER or any persons hired directly by the OWNER and is not due to or affected by the negligent acts or omissions of CONTRACTOR or any subcontractor used by Contractor.

## ARTICLE 07   CONTRACTOR RESPONSIBILITIES

CONTRACTOR shall Supply labor, equipment, tools, construction equipment and machinery, transportation and other facilities and services necessary for the proper execution and completion of the Work.

CONTRACTOR shall supervise and direct CONTRACTOR'S Work. CONTRACTOR shall be solely responsible for and have control over all construction means, engineers, architect's, designers, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract. OWNER may not supply any materials or labor for Work to be completed under this Contract except those associated with allowance items, which will be agreed to with the Contractor,

CONTRACTOR shall prepare and submit to OWNER a construction schedule for the Work. The schedule shall be revised at appropriate times as required by the conditions of the Work and Project.

CONTRACTOR shall provide OWNER reasonable access to the Project.

CONTRACTOR agrees that OWNER shall have the authority to reject Work of CONTRACTOR that does not conform to this Contract.

Due to changes in and availability of manmade and natural materials, products, colors, updated building codes etc., with permission of OWNER, CONTRACTOR may substitute products or materials of equal value or greater value and similar appearance to those goods specified for the Project.

CONTRACTOR shall indemnify and hold harmless the OWNER from and against all claims, damages, losses and expenses arising out of or resulting from the performance of the Work subsequent to the date of this Agreement, provided that any such claim, damage, loss or expense (i) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property including the loss of use resulting therefrom, and (ii) is caused in whole or in part by any negligent act or omission of the CONTRACTOR or any subcontractor and is not due to or affected by the negligent acts or omissions of OWNER.

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

### ARTICLE 08   LAWS, PERMITS, FEES AND NOTICES

Contractor as is described in the Contract Cost Estimate section 00.220 shall pay for all permits, fees, approvals, easements, assessments, inspections and charges required for the performance of Work on the Project. CONTRACTOR shall coordinate and procure the Site Improvement Location Certificate, the building permit from the governing authority, and all required building inspections. CONTRACTOR shall secure and pay for licenses necessary for the performance of CONTRACTOR'S Work.

CONTRACTOR shall give notices and comply with laws, ordinances, rules, regulations and orders of public authorities applicable to the Work of this Contract, including all state and local tax laws, social security acts, unemployment compensation acts and workers' compensation applicable to the performance of this Contract.

### ARTICLE 09   CLEAN UP

CONTRACTOR shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations performed under this Contract. At completion of the Work, CONTRACTOR shall remove from the Project waste materials, rubbish, CONTRACTOR'S tools, construction equipment, machinery and surplus materials. CONTRACTOR shall not be held responsible for unclean conditions caused by OWNER, it agents or other CONTRACTORs.

### ARTICLE 10   SAFETY

CONTRACTOR shall take reasonable safety precautions, shall comply with safety measures initiated by OWNER and shall comply with applicable laws, ordinances, rules, regulations and orders of public authorities for the safety of persons and property with respect to performance of this Contract. CONTRACTOR shall report to OWNER within three days an injury to an employee or agent of CONTRACTOR that occurred at the site.

If CONTRACTOR encounters on the site material reasonably believed to be asbestos or polychlorinated biphenyl (PCB) or other hazardous materials which have not been rendered harmless, CONTRACTOR shall immediately stop Work in the affected area and report the condition to OWNER in writing. OWNER shall take all necessary measures to ensure the Hazardous Condition is remediated and rendered harmless. When the material or substance has been rendered harmless, CONTRACTOR'S Work in the affected area shall resume upon written agreement of OWNER and CONTRACTOR. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of CONTRACTOR'S reasonable additional costs of demobilization, delay and remobilization, in accordance with Article 5 of this Contract.

### ARTICLE 11   CORRECTION OF WORK

The CONTRACTOR shall correct any work performed by the CONTRACTOR that fails to conform with the requirements of this Agreement and the Contract Documents and shall at CONTRACTOR'S expense remedy any such defects due to faulty workmanship in accordance with the CONTRACTOR'S Limited Warranty. Owner may at any time request that Architect interpret and decide conformance with the Contract Documents or identify defects.

The OWNER shall upon discovery of such defects promptly notify the CONTRACTOR in writing of the defect and request correction in accordance with the CONTRACTOR'S Limited Warranty (Article 12). The provisions of this section apply to work done by subcontractors under the CONTRACTOR'S control as well as work done by direct employees of the CONTRACTOR.

If the OWNER prefers to accept defective or non-conforming Work with the consent of the CONTRACTOR, they may do so instead of requiring its removal and correction, in which case a Change Order will be issued to reflect a mutually agreed reduction in the Contract Sum already paid or to be paid.

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

## ARTICLE 12    LIMITED WARRANTY PERSONAL GUARANTEE

Contractor will provide Owner with a ten year structural warranty, such that any issues no matter what the cause, other than gross negligence of the Owner, of a structural nature that occur during the period will be fixed by the Contractor. Owner acknowledges that if the structural issue is caused by an architectural (BHH Partners) or engineering (Engineering Design Works) design flaw then Contractor and Owner will look to the respective firms to cover the costs of needed repairs.

Contractor will also provide Owner with a whole house warranty on any item or issue in or with the house, except those manufactured items noted below and personal items purchased by the Owner after the CO is received, for a period of five years. This warranty is the equivalent of a bumper to bumper warranty on an automobile. The only additional exception would be if there is evidence of neglect or inadequate maintenance required by the owner to prevent such measures, which would make this warranty invalid. The OWNER shall maintain a scheduled preventive maintenance program throughout this period for items that require maintenance, a list of which will be provided by the Contractor and must be agreed upon by the Owner upon completion of the home. CONTRACTOR is not responsible for providing scheduled maintenance as part of this Contract.

Contractor acknowledges that if the insurance for RJB Development (the Company) is not maintained or is not adequate to cover any claims or issues in this Contract, including not completing the work, or the Company itself does not exist, the Owner may hold Randy Barrientez personally liable to meet the performance of items within this Contract – this is a Personal Guarantee by Randy Barrientez,

CONTRACTOR warrants to OWNER that materials and equipment furnished under this Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents and that the Work of this Contract will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents..

With respect to any fire, alarm, or other life-safety or security system installed in or servicing the project, CONTRACTOR'S liability under this limited warranty shall be limited to the cost of correcting any defective workmanship or replacing any defective materials in such systems.

This limited warranty does not extend for a time period past those provided by the manufacturer for items noted in this paragraph. CONTRACTOR shall assign and supply OWNER with any additional warranties of suppliers or manufacturers at the completion of CONTRACTOR'S Work.   CONTRACTOR shall not be responsible for the performance of any manufacturer under manufacturer's warranties, with regard to any appliances, the hot tub, and the boilers..

This limited warranty excludes any responsibility on the part of CONTRACTOR to remedy any defect or deficiency caused by any error or omission in the Drawings or Specifications, misuse by OWNER or others, changes or modifications not performed by CONTRACTOR except where CONTRACTOR has failed to act, improper, inadequate or insufficient maintenance or operation, and normal wear and tear.

CONTRACTOR makes no representations or warranties, express or implied, concerning the presence or absence of radon or environmental pollutants in the Property or Residence.

CONTRACTOR is entitled to rely on the recommendations of a qualified soils engineer for the foundation design. CONTRACTOR will hire a third party geotechnical engineer who will visit the site at excavation and provide if necessary a written report of findings to the CONTRACTOR and prior to foundation placement. This cost will be added to the GMP Contract. Owner waives any claims arising from catastrophic acts of god, such as significant earthquakes, significant avalanches, significant changes in underground springs that were unforeseen at the time of building, and a significant mountain mudslide.

EXCEPT AS PROVIDED IN THIS ARTICLE, CONTRACTOR MAKES NO WARRANTY OR REPRESENTATION.

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

## ARTICLE 13   PROGRESS PAYMENTS

OWNER shall make progress payments in proportion to the Work completed during the construction process. CONTRACTOR shall submit to OWNER a written Draw Request. Draw Requests shall be itemized showing the Cost of the Work and CONTRACTOR'S Fee for each item included in the Draw Request, and shall include supporting invoices, receipts or other documentation evidencing the Cost of the Work, as well as a lien waivers in a form acceptable to Owner for that portion of the Work completed during the previous paid payment application.

If payment is requested on account of materials or equipment not yet incorporated in the Work, but ordered to be delivered and stored at the site or some other location agreed upon by OWNER, such payments may be conditioned upon CONTRACTOR providing proof of placement of the order to the manufacturer or supplier or such materials or equipment, and, as the case may be, delivery of the same. If a deposit is required for materials, e.g. window and cabinet orders, OWNER shall pay this sum prior to the deposit date. OWNER shall pay CONTRACTOR within 15 **(Fifteen) Days** after CONTRACTOR'S submission of its Draw Request to OWNER. An **18%** per annum interest charge shall be added to all late payments.

If, through no fault of CONTRACTOR, OWNER does not make payment within **30** days after the date it becomes due, then without prejudice to any other right or remedy CONTRACTOR may have, CONTRACTOR may stop all Work until payment of the amount owing has been received.

Except with the OWNER'S prior approval, labor portions of payments to Subcontractors shall be subject to retainage of **five percent (5%)**. Withheld retainage monies shall be paid in full by the OWNER after a maximum period of **one hundred and twenty (120) days** following the Application for Payment in which the monies were withheld.

Notwithstanding the above, payments may be withheld by Owner on account of (1) defective work not remedied; (2) claims filed by third parties; (3) failure of Contractor to make payments properly to subcontractors or for labor, materials or equipment; (4) reasonable evidence that the Work cannot be completed for the unpaid balance of the Guaranteed Maximum Price; (5) damage to the Owner; (6) reasonable evidence that the Work will not be completed within the Contract Time and that the unpaid balance of the Guaranteed Maximum Price would not be adequate to cover actual damages for the anticipated delay; or (7) persistent failure to carry out the Work in accordance with the Contract Documents.

## ARTICLE 14   FINAL PAYMENT

Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by OWNER to CONTRACTOR when:

a)   CONTRACTOR'S Work is fully performed in accordance with the requirements of the Contract Documents and this Agreement;
b)   CONTRACTOR has submitted its final Draw Request to OWNER;
c)   CONTRACTOR has executed and delivered to OWNER all required warranties;
d)   CONTRACTOR has delivered 'as built' drawings relating to the Work, if required;
e)   A Permanent or Temporary Certificate of Occupancy for the Property has been issued by the appropriate governmental agency; and
f)   CONTRACTOR has completed the work required by the Punch List as outlined in Article 15

The tender by OWNER and the receipt by CONTRACTOR of final payment shall constitute a waiver of all claims by one against the other relating to CONTRACTOR'S Work, except that it shall in no way relieve CONTRACTOR of responsibility for warranty work under Article 12 of this Contract.

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

## ARTICLE 15   PUNCH LIST

Within 365 Days after receipt by OWNER of CONTRACTOR'S written notice of substantial completion, OWNER shall inspect the Project in CONTRACTOR'S presence. At that time, OWNER shall give CONTRACTOR one signed Punch List identifying any deficiencies in workmanship or materials noted by OWNER. If OWNER does not inspect the project within said time period, the right to object to completion will be waived.

CONTRACTOR shall correct any items on OWNER'S Punch List that are deficient in workmanship and/or materials according to appropriate standards of construction. Any dispute on items appropriate for the Punch List will be reviewed and decided by the Architect.

CONTRACTOR shall correct those defects at its cost within a reasonable period of time. CONTRACTOR has no obligation to make any repairs not included on OWNER'S signed Punch List, except as provided in Article 11 or Article 12 herein.

## ARTICLE 16   ACCOUNTING RECORDS

CONTRACTOR shall keep detailed accounts and exercise such controls as may be necessary for detailed and responsible financial management of all aspects of the Project. CONTRACTOR shall make these records reasonably available to OWNER on the request of OWNER.

## ARTICLE 17   INSURANCE

CONTRACTOR shall take out and maintain insurance for the entire time of the Contract as follows:
General Liability insurance of not less than [$2,000,000];
Automobile Liability insurance of not less than [$500,000];
Workman's Compensation and Employer's Liability insurance as required by statute.

CONTRACTOR shall take out and maintain in the name of CONTRACTOR for the benefit of OWNER, CONTRACTOR and Subcontractors for the entire time of the Contract as follows:
Builder's Risk insurance coverage on the Project to the full value of the Work of not less than [$2,300,000].

Contractor acknowledges that Owner is not responsible for any insurance on the property until a CO is received, thus any and all risk to the property during construction resides with the Contractor including acts of God with the exceptions of War, acts of Government and Earthquakes. For example: if the house is substantially complete and two days before a CO is received lightening strikes the house and it burns down, the Contractor is responsible to rebuild the house.

Coverages, whether written on an occurrence or claims-made basis, shall be maintained without interruption from date of commencement of CONTRACTOR'S Work until date of final payment and termination of any coverage required to be maintained after final payment to CONTRACTOR.

Certificates of insurance acceptable to OWNER and CONTRACTOR shall be filed with OWNER and CONTRACTOR prior to commencement of CONTRACTOR'S Work. Each certificate and policy shall contain a provision that the policy will not be cancelled or allowed to expire until at least 30 days' prior written notice has been given to OWNER and CONTRACTOR.

## ARTICLE 18   TEMPORARY FACILITIES

CONTRACTOR shall furnish and make available to OWNER the following temporary facilities, equipment and services; these shall be furnished at no cost to OWNER unless otherwise indicated:
[Temporary electric, gas and water]

Page 11 of 13

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

**ARTICLE 19   ASSIGNMENT**

CONTRACTOR shall not assign the Work of this Contract without the written consent of OWNER, nor contract the whole or any part of this Contract without the written consent of OWNER.

**ARTICLE 20   DEFAULT**

If CONTRACTOR defaults or neglects to carry out the Work in accordance with this Contract and fails within 15 working days after receipt of written notice from OWNER to commence and continue correction of such default or neglect with diligence, OWNER may, after five days following receipt by CONTRACTOR of an additional written notice, and without prejudice to any other remedy OWNER may have, make good such deficiencies and may deduct the reasonable cost thereof from the payments then or thereafter due CONTRACTOR.

**ARTICLE 21   TERMINATION OR SUSPENSION**

**A.     TERMINATION BY CONTRACTOR**

If the Work is stopped, or if payment of amounts due under this Contract is not made, for a period of **30 Days**, through no act or fault of CONTRACTOR, or its agents or employees or any other persons performing portions of the Work under contract with CONTRACTOR, because OWNER failed to fulfill its material obligations under the Contract, CONTRACTOR may, upon five days written notice to OWNER, terminate the Contract. In the event of such termination by CONTRACTOR for any reason which is not the fault of CONTRACTOR, its subcontractors, material suppliers, or their agents or employees, CONTRACTOR shall be entitled to recover from OWNER payment for Work executed including all retainages and withheld payments; and for loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

**B.     TERMINATION BY OWNER**

If CONTRACTOR repeatedly fails or neglects to carry out the Work in accordance with the Contract Documents or otherwise to perform in accordance with this Contract and fails within **15 Days** after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, OWNER may, after five days following receipt by CONTRACTOR of an additional written notice and without prejudice to any other remedy OWNER may have, terminate the Contract and finish CONTRACTOR'S Work by whatever method OWNER may deem expedient.

**C.     SUSPENSION**

OWNER may order CONTRACTOR in writing to suspend, delay or interrupt the Work of this Contract in whole or in part for a period of time, not exceeding 15 days. In the event of suspension ordered by OWNER, CONTRACTOR shall be entitled to an equitable adjustment of the Contract Time and Contract Sum, including CONTRACTOR'S reasonable costs of shut-down, delay and start-up.

**ARTICLE 22   NOTICES AND CONTRACT ADMINISTRATION**

All normal correspondence (ie. change orders, payment requests) shall be sent via email, mail, fax or hand delivered. All legal notices shall be sent certified mail, return receipt requested or hand delivered to the addresses listed below.

The OWNER'S designated representative will provide administration of the Contract and will be the OWNER'S representative for the duration of this contract. The OWNER'S designated representative shall be:

Page 12 of 13

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

| Jim and or Kimberly Rallo | Owner | (443) 255-4541 |
|---|---|---|
| *NAME* | *TITLE* | *PHONE #* |
| 10104 Flower Gate Terrace | Jim.rallo@ | (202) 467-5881 |
| Potomac, MD. 20854 | Liquiditityservicesinc | |
| | .com | |
| *ADDRESS* | *EMAIL* | *FAX #* |

The CONTRACTOR'S designated representative will provide administration of the Work and will be the CONTRACTOR'S representative during construction until final payment is due.  The CONTRACTOR'S designated representative shall be:

| Randy Barrientez | President | (970) 513-0777 |
|---|---|---|
| *NAME* | *TITLE* | *PHONE #* |
| PO Box 25720 - Silverthorne, CO 80497 | randy@rjbdevelopment.com | (970) 513-0770 |
| *ADDRESS* | *EMAIL* | *FAX #* |

## ARTICLE 23    DISPUTES

Any claim arising out of or related to this Contract shall be subject to mediation as a condition precedent to the institution of legal proceedings by either party.  Requests for mediation shall be filed in writing by the other party to this Contract.  The mediation shall be held in Summit County, Colorado, unless otherwise agreed by the parties. The parties shall share the mediator's fee and any filing fees equally.

Should OWNER or CONTRACTOR employ an attorney to enforce any of the provisions of this Contract or to protect its interest in any matter arising under this Contract, or to collect damages from this Contract, the prevailing party shall be reimbursed for all reasonable costs and attorney's fees incurred in connection therewith.  Any action or proceeding brought in relation to this Contract shall be in Summit County, Colorado.

## ARTICLE 24    MISCELLANEOUS

This Contract shall be governed by the law of the State of Colorado.

The failure of either CONTRACTOR or OWNER to insist on the performance of any of term or condition of this Contract shall not be construed as a waiver of such term or condition.

## AGREED AS WRITTEN ABOVE:

| Randy Barrientez | President | DATE |
|---|---|---|
| RJB Development Inc. | | |

Jim Rallo                                                                              DATE    8/9/13

Kimberly Rallo                                                                   DATE    8/9/13

Page 13 of 13

CONSTRUCTION CONTRACT - OWNER AND CONTRACTOR - COST PLUS WITH A GMP

# COST CONTROL ESTIMATE

**RALLO RESIDENCE**
Lot 07, Trappers Glen
Breckenridge CO 80424

*Updated*
Enter Date

*CCE Notes*
Enter Notes Here

| | |
|---|---:|
| Living Area | 6,845 |
| Unfinished | 0 |
| Garage | 1,205 |
| SUB-TOTAL | 8,050 |
| Decks | — |
| Patios | — |
| Driveway | — |
| Other | — |
| TOTAL | 8,050 |

| CODE | DESCRIPTION | AMOUNT | $ Per Sq/Ft |
|---|---|---:|---:|
| **00.000** | **PROCUREMENT** | **41,550** | **5.16** |
| 00.100 | Architect | | |
| 00.110 | Structural Engineer | | |
| 00.120 | Soils Engineer | | |
| 00.130 | Civil Engineer | | |
| 00.140 | Interior Design | | |
| 00.200 | DRB / ARC | | |
| 00.210 | Planning Department | | |
| 00.220 | Building Department | 40,300 | 5.01 |
| 00.230 | Water Tap Fees | | |
| 00.240 | Sewer Tap Fees | | |
| 00.300 | Efficient Building Programs | 750 | 0.09 |
| 00.310 | Printing Costs | 500 | 0.06 |
| 00.320 | Lot Costs | | |
| 00.400 | Construction Financing | | |
| 00.410 | Sales Costs | | |
| 00.999 | Other Procurement | | |
| **01.000** | **GENERAL CONDITIONS** | **162,400** | **20.17** |
| 01.100 | Project Supervision | 62,388 | 7.75 |
| 01.200 | Progress Cleaning | 12,000 | 1.49 |
| 01.210 | Site Maintenance | | |
| 01.220 | Construction Waste Disposal | 6,000 | 0.75 |
| 01.230 | Window Cleaning | 3,750 | 0.47 |
| 01.240 | Final Cleaning | 2,013 | 0.25 |
| 01.300 | Site Surveys & Staking | 2,200 | 0.27 |
| 01.310 | Improvement Location Certificates | 200 | 0.02 |
| 01.320 | Quality Control Services | | |
| 01.400 | Temporary Electricity | 3,220 | 0.40 |
| 01.410 | Temporary Heating | 4,025 | 0.50 |
| 01.420 | Temporary Lighting | — | |
| 01.430 | Temporary Gas | 0 | 0.00 |

RJB DEVELOPMENT INC.          Page 1 of 8

PO Box 25720 - Silverthorne, CO 80497
P (970) 513-0777 - F (970) 513-0770
RJBdevelopment.com

| | | | |
|---|---|---|---|
| 01.440 | Temporary Telecommunications | | |
| 01.450 | Temporary Water | 600 | 0.07 |
| 01.460 | Sanitary Facilities | 1,200 | 0.15 |
| 01.470 | Temporary Labor Services | 20,125 | 2.50 |
| 01.480 | Temporary Access Roads | | |
| 01.481 | Temporary Parking Areas | | |
| 01.482 | Temporary Barriers and Enclosures | | |
| 01.483 | Project Identification & Signage | 1,500 | 0.19 |
| 01.490 | Equipment Rentals | 21,000 | 2.61 |
| 01.500 | Builder's Risk Insurance | 6,000 | 0.75 |
| 01.510 | Performance Bond | | |
| 01.520 | Project Liability Insurance | 16,180 | 2.01 |
| 01.530 | Workman's Compensation | | |

| | | | |
|---|---|---|---|
| **02.000** | **SITEWORK** | **172,076** | **21.38** |
| 02.100 | Demolition | | |
| 02.110 | Site Clearing | 6,521 | 0.81 |
| 02.120 | Radon Mitigation | 1,000 | 0.12 |
| 02.200 | Grading & Excavation | 48,300 | 6.00 |
| 02.210 | Dewatering | 78,260 | 9.72 |
| 02.220 | Soil Import & Export | 20,125 | 2.50 |
| 02.300 | Soil Stabilization | | |
| 02.310 | Special Trenching | | |
| 02.999 | Other Sitework | 17,871 | 2.22 |

| | | | |
|---|---|---|---|
| **03.000** | **CONCRETE** | **105,937** | **13.16** |
| 03.100 | Footers & Foundation | 51,339 | 6.38 |
| 03.110 | Flatwork | 17,704 | 2.20 |
| 03.120 | Lightweight Concrete | 7,214 | 0.90 |
| 03.130 | Cementitious Decks | 25,500 | 3.17 |
| 03.200 | Grouting | | |
| 03.210 | Concrete Cutting & Boring | | |
| 03.220 | Specialty Concrete | | |
| 03.999 | Other Concrete | 4,180 | 0.52 |

| | | | |
|---|---|---|---|
| **04.000** | **MASONRY** | **95,760** | **11.90** |
| 04.100 | Block Masonry | | |
| 04.110 | Glass Unit Masonry | | |
| 04.200 | Exterior Stone Veneer | 66,880 | 8.31 |
| 04.210 | Interior Stone Veneer | 28,880 | 3.59 |
| 04.999 | Other Masonry | | |

| | | | |
|---|---|---|---|
| **05.000** | **METALS** | **37,900** | **4.71** |
| 05.100 | Structural Steel | 11,000 | 1.37 |
| 05.110 | Structural Steel Labor | 8,100 | 1.01 |

PO Box 25720 – Silverthorne, CO 80497
P (970) 513-0777 - F (970) 513-0770
RJBdevelopment.com

| 05.200 | Metal Stairs | | |
|--------|--------------|------|------|
| 05.210 | Exterior Metal Railings | 5,800 | 0.72 |
| 05.220 | Interior Metal Railings | 4,500 | 0.56 |
| 05.300 | Metal Grating | | |
| 05.310 | Metal Balconies | | |
| 05.320 | Decorative Metal | 6,900 | 0.86 |
| 05.999 | Other Metals | 1,600 | 0.20 |

| 06.000 | WOOD PLASTICS AND COMPOSITES | 412,730 | 51.27 |
|--------|------------------------------|---------|-------|
| 06.100 | Rough Carpentry | 81,548 | 10.13 |
| 06.110 | Rough Carpentry Labor | 77,660 | 9.65 |
| 06.120 | Structural Wood Systems | | |
| 06.130 | Heavy Timber Construction | 58,245 | 7.24 |
| 06.140 | Glue-Laminated Construction | | |
| 06.150 | Trusses | | |
| 06.200 | Finish Carpentry | 35,564 | 4.42 |
| 06.210 | Finish Carpentry Labor | 39,995 | 4.97 |
| 06.220 | Wall Paneling | | |
| 06.230 | Ceiling Paneling | 8,100 | 1.01 |
| 06.240 | Wood Stairs | | |
| 06.250 | Exterior Wood Railings | 753 | 0.09 |
| 06.260 | Interior Wood Railings | 1,370 | 0.17 |
| 06.270 | Custom Built-Ins | | |
| 06.280 | Closet Shelving | | |
| 06.290 | Custom Woodwork | | |
| 06.300 | Cabinetry | 105,000 | 13.04 |
| 06.310 | Cabinetry Installation | | |
| 06.320 | Cabinetry Hardware | | |
| 06.400 | Decking | | |
| 06.410 | Decking Labor | | |
| 06.999 | Other Wood Plastics & Composites | 4,500 | 0.56 |

| 07.000 | THERMAL AND MOISTURE PROTECTION | 154,156 | 19.15 |
|--------|----------------------------------|---------|-------|
| 07.100 | Dampproofing & Waterproofing | 3,816 | 0.47 |
| 07.110 | Weather Barriers | 1,664 | 0.21 |
| 07.200 | Foundation Insulation | 3,360 | 0.42 |
| 07.210 | Underslab Insulation | 6,930 | 0.86 |
| 07.220 | Insulation System | 30,429 | 3.78 |
| 07.230 | Exterior Insulation System | 3,375 | 0.42 |
| 07.240 | Advanced Sealing Package | 3,349 | 0.42 |
| 07.300 | Shingle & Shake Roofing | 27,800 | 3.45 |
| 07.310 | Metal Roofing | | |
| 07.320 | Membrane Roofing | 11,760 | 1.46 |
| 07.400 | Wood Siding & Trim | 26,258 | 3.26 |
| 07.410 | Wood Siding & Trim Labor | 18,756 | 2.33 |

PO Box 25720 - Silverthorne, CO 80497
P (970) 513-0777 - F (970) 513-0770
RJBdevelopment.com

| | | |
|---|---|---|
| 07.420  Metal Siding & Trim | - | - |
| 07.430  Metal Siding & Trim Labor | - | - |
| 07.500  Flashing & Sheet Metal | 3,800 | 0.47 |
| 07.510  Gutters & Downspouts | 5,038 | 0.63 |
| 07.520  Decorative Shrouds | 2,000 | 0.25 |
| 07.530  Snow Guards | 980 | 0.12 |
| 07.600  Fire & Smoke Protection | - | - |
| 07.610  Caulking & Chinking | 700 | 0.09 |
| 07.700  Deck Waterproofing | 3,297 | 0.41 |
| 07.999  Other Thermal & Moisture Protection | 844 | 0.10 |

| | | |
|---|---|---|
| **08.000   OPENINGS** | **132,208** | **16.42** |
| 08.100  Entrances | 4,493 | 0.56 |
| 08.110  Exterior Doors | - | - |
| 08.120  Interior Doors | 23,550 | 2.93 |
| 08.130  Overhead Doors | 12,665 | 1.57 |
| 08.140  Specialty Doors | - | - |
| 08.200  Door Hardware | 6,500 | 0.81 |
| 08.300  Windows | 80,000 | 9.94 |
| 08.310  Skylights | - | - |
| 08.400  Decorative Glazing | - | - |
| 08.410  Mirrors | 5,000 | 0.62 |
| 08.420  Glazing Surface Films | - | - |
| 08.500  Louvers & Vents | - | - |
| 08.999  Other Openings | - | - |

| | | |
|---|---|---|
| **09.000   FINISHES** | **192,767** | **23.95** |
| 09.100  Drywall & Plaster | 33,810 | 4.20 |
| 09.110  Backing Boards & Underlayments | - | - |
| 09.200  Tile Flooring | 27,000 | 3.35 |
| 09.210  Tile Surround | - | - |
| 09.220  Tile Countertops | - | - |
| 09.230  Tile Labor | 37,980 | 4.72 |
| 09.240  Shower Pans & Waterproofing | - | - |
| 09.250  Specialty Ceilings | - | - |
| 09.300  Flooring Treatments | - | - |
| 09.310  Masonry Flooring | - | - |
| 09.320  Wood Flooring | 32,977 | 4.10 |
| 09.330  Finished Concrete Flooring | - | - |
| 09.340  Epoxy Coatings | - | - |
| 09.350  Carpeting | 9,000 | 1.12 |
| 09.360  Specialty Flooring | - | - |
| 09.400  Wall Coverings | - | - |
| 09.410  Acoustic Treatments | - | - |
| 09.500  Interior Painting | 17,500 | 2.17 |

PO Box 25720 – Silverthorne, CO 80497
P (970) 513-0777 – F (970) 513-0770
RJBdevelopment.com

| 09.510 | Exterior Painting | 11,500 | 1.43 |
|--------|-------------------|--------|------|
| 09.520 | Staining & Finish | 23,000 | 2.86 |
| 09.530 | Faux Finishes | | |
| 09.540 | High Performance Coatings | | |
| 09.550 | Special Coatings | | |
| 09.560 | Stucco | | |
| 09.999 | Other Finishes | | |

| 10.000 | SPECIALTIES | 55,600 | 6.91 |
|--------|-------------|--------|------|
| 10.100 | Signage | | |
| 10.200 | Bath Hardware & Accessories | 2,200 | 0.27 |
| 10.210 | Tub & Shower Doors | 15,000 | 1.86 |
| 10.220 | Laundry Accessories | | |
| 10.300 | Fireplaces & Stoves | 36,000 | 4.47 |
| 10.310 | Exterior Fire Features | | |
| 10.400 | Emergency Aid Specialties | | |
| 10.410 | Fire Protection Specialties | 2,000 | 0.25 |
| 10.500 | Storage Assemblies | | |
| 10.510 | Wardrobe & Closet Specialties | | |
| 10.520 | Closet Hardware & Accessories | 400 | 0.05 |
| 10.530 | Wine Storage | | |
| 10.600 | Exterior Specialties | | |
| 10.999 | Other Specialties | | |

| 11.000 | EQUIPMENT | 35,000 | 4.35 |
|--------|-----------|--------|------|
| 11.100 | Central Vacuum | | |
| 11.200 | Appliances | 35,000 | 4.35 |
| 11.210 | Appliance Installation | | |
| 11.300 | Recreational Equipment | | |
| 11.310 | Playfield Equipment | | |
| 11.999 | Other Equipment | | |

| 12.000 | FURNISHINGS | 35,000 | 4.35 |
|--------|-------------|--------|------|
| 12.100 | Art | | |
| 12.110 | Window Treatments | | |
| 12.120 | Specialty Casework | | |
| 12.200 | Concrete Countertops | | |
| 12.210 | Metal Countertops | | |
| 12.220 | Wood Countertops | | |
| 12.230 | Composite Countertops | | |
| 12.240 | Stone Countertops | 35,000 | 4.35 |
| 12.300 | Furnishings & Accessories | | |
| 12.310 | Furniture | | |
| 12.320 | Multiple Seating | | |
| 12.999 | Other Furnishings | | |

| 13.000 | SPECIAL CONSTRUCTION | 17,500 | 2.17 |
|---|---|---|---|
| 13.100 | Fountains | | |
| 13.110 | Aquariums | | |
| 13.120 | Hot Tubs | 8,000 | 0.99 |
| 13.130 | Saunas | 7,500 | 0.93 |
| 13.140 | Vaults | | |
| 13.150 | Special Structures | | |
| 13.999 | Other Special Construction | 2,000 | 0.25 |

| 14.000 | CONVEYING EQUIPMENT | - | - |
|---|---|---|---|
| 14.100 | Elevators | | |
| 14.110 | Lifts | | |
| 14.999 | Other Conveying Equipment | | |

| 15.000 | PLUMBING | 72,767 | 9.04 |
|---|---|---|---|
| 15.100 | Lift Station & Alarms | | |
| 15.110 | Plumbing System | 39,767 | 4.94 |
| 15.120 | Piping & Equipment Insulation | - | |
| 15.130 | Water Filtration Equipment | | |
| 15.200 | Toilets, Urinals & Bidets | 4,000 | 0.50 |
| 15.210 | Lavatories & Sinks | 4,800 | 0.60 |
| 15.220 | Bathtubs | 9,000 | 1.12 |
| 15.230 | Shower Systems | 7,000 | 0.87 |
| 15.240 | Faucets, Supplies & Trim | 6,400 | 0.80 |
| 15.999 | Other Plumbing | 1,800 | 0.22 |

| 16.000 | ELECTRICAL | 95,398 | 11.85 |
|---|---|---|---|
| 16.100 | Photovoltaic Solar System | 30,000 | 3.73 |
| 16.110 | Wind Energy System | | |
| 16.120 | Battery Equipment | | |
| 16.200 | Filters, Conditioners & Protection | | |
| 16.210 | Electrical System | 38,238 | 4.75 |
| 16.300 | Interior Lighting Fixtures | 25,000 | 3.11 |
| 16.310 | Interior Fluorescent Lighting | | |
| 16.320 | Exterior Lighting | | |
| 16.400 | Heat Trace Cable | 2,160 | 0.27 |
| 16.999 | Other Electrical | | |

| 17.000 | MECHANICAL | 103,271 | 12.83 |
|---|---|---|---|
| 17.100 | HVAC System | | |
| 17.110 | Exhaust Venting | | |
| 17.120 | Duct & Equipment Insulation | | |
| 17.130 | Air Distribution & Filtration System | 3,800 | 0.47 |
| 17.200 | Mechanical System | 66,171 | 8.22 |

PO Box 25720 - Silverthorne, CO 80497
P (970) 513-0777 - F (970) 513-0770
RJBdevelopment.com

| 17.210 | Thermal Solar System | | |
|---|---|---|---|
| 17.220 | Humidity Control System | 3,300 | 0.41 |
| 17.230 | Auxiliary Heating | | |
| 17.240 | Snowmelt System | 30,000 | 3.73 |
| 17.250 | Radon Mitigation | | |
| 17.999 | Other Mechanical | | |

| 18.000 | FIRE SUPPRESSION | 20,045 | 2.49 |
|---|---|---|---|
| 18.100 | Fire Sprinkler System | 20,045 | 2.49 |
| 18.110 | Fire Pumps | | |
| 18.120 | Fire Suppression Water Storage | | |
| 18.999 | Other Fire Suppression | | |

| 19.000 | COMMUNICATIONS & SECURITY | 33,641 | 4.18 |
|---|---|---|---|
| 19.100 | Integrated Automation Mechanical | 7,800 | 0.97 |
| 19.110 | Integrated Automation Electrical | | |
| 19.120 | Integrated Automation Communications | | |
| 19.130 | Integrated Automation Other | | |
| 19.200 | Voice / Data / AV Connectivity | 4,750 | 0.59 |
| 19.210 | Voice Communications Equipment | 3,462 | 0.43 |
| 19.220 | Data Communication Equipment | | |
| 19.230 | AV Communications Equipment | 7,970 | 0.99 |
| 19.300 | Access Control System | | |
| 19.310 | Intrusion Detection & Alarm | 9,660 | 1.20 |
| 19.320 | Fire Detection & Alarm | | |
| 19.999 | Other Communications & Security | | |

| 20.000 | EXTERIOR IMPROVEMENTS | 68,110 | 8.46 |
|---|---|---|---|
| 20.100 | Paving Base | | |
| 20.110 | Asphalt Paving | 26,550 | 3.30 |
| 20.120 | Concrete Paving | | |
| 20.130 | Flagstone & Pavers | | |
| 20.140 | Curbs & Gutters | | |
| 20.150 | Patios & Walkways | | |
| 20.160 | Paving Specialties | | |
| 20.200 | Fencing & Gates | | |
| 20.210 | Retaining Walls | 21,560 | 2.68 |
| 20.220 | Wetlands Mitigation | | |
| 20.300 | Irrigation | | |
| 20.310 | Erosion Control | | |
| 20.320 | Final Grading & Landscaping | 20,000 | 2.48 |
| 20.999 | Other Exterior Improvements | | |

| 21.000 | UTILITIES | 2,500 | 0.31 |
|---|---|---|---|
| 21.100 | Water Service Connection | | |

PO Box 25720 - Silverthorne, CO 80497
P (970) 513-0777 - F (970) 513-0770
RJBdevelopment.com

| | | |
|---|---|---|
| 21.110  Water Supply Well System | | |
| 21.200  Sanitary Sewerage Service Connection | | |
| 21.210  Sanitary Sewerage Septic System | | |
| 21.230  Storm Drainage Utilities | | |
| 21.300  Electrical Utilities | | |
| 21.310  Electrical Utilities Construction | 1,250 | 0.16 |
| 21.400  Gas Utilities | | |
| 21.410  Gas Utilities Construction | 1,250 | 0.16 |
| 21.500  Voice Communications Utilities | | |
| 21.510  AV Communications Utilities | | |
| 21.999  Other Utilities | | |

| | | |
|---|---|---|
| **99.000   MARKUP & CONTINGENCY** | **81,205** | **10.09** |
| 99.100  Overhead & Profit | 81,205 | 10.09 |
| 99.200  Administration Fees | | |
| 99.300  Contingency | | |

| | | |
|---|---|---|
| TOTAL | 2,127,520 | 264.29 |

## COST CONTROL NOTES

* All listed pricing per sq/ft is calculated from the "Sub-Total" sq/ft listed above (Living, Unfinished & Garage Square Footage).

* This Cost Control Estimate is based on information available to and provided to RJB Development by the Owner, Architect and Engineers and DO NOT constitute a lump sum or guaranteed maximum price unless agreed on elsewhere in writing between RJB Development

## LABLES FOR LINE ITEM TYPES

Indicates an "Allowance" line item.

Indicates that the item is "NOT Included in the CCE. No cost or allowance has been designated.

Indicates that the item is "Included" in the CCE. If line item is "$0" the cost is included in another line item cost.

RJB DEVELOPMENT INC.            Page 8 of 8            PO Box 25720 - Silverthorne, CO 80497
P (970) 513-0777 - F (970) 513-0770
RJBdevelopment.com

**Jim Rallo**
_____

**From:**          Randy Barrientez <randy@rjbdevelopment.com>
**Sent:**          Friday, August 09, 2013 3:53 PM
**To:**            Jim Rallo
**Subject:**       CCE / Contract
**Attachments:**   CCE - 07TG Rallo Residence.xlsx.pdf; (Rallo) RJB Owner Construction Contract (Cost Plus
                   GMP Cost Savings) Clean Final version.docx

Jim

I received your email today approving of the attached contract. Per our phone conversation today I am attaching the
new updated 8/9/13 CCE to reflect our phone conversation and the new contract amount. The office will have our
insurance company send you the General Liability Policy for the $2M coverages. The builders risk policy will be
issued at start of wood framing. I accept the conditions of the attached contract and CCE. I will work with BHH in
getting the new plans printed........however BHH WILL charge us for doing these and charge for printing the new
plans. Are you sure we NEED to have these re-done and printed. To save extra cost we could do 8.5" x 11" copies
of things that are important such as the foundation changes. A lot of this does not need to be redrawn. We can
identify on your and my set of plans exactly where the under drains are located for any future references. Or you
can have BHH do it all, we can discuss this later.

Thank you,

Randy Barrientez

President | RJB Development Inc.

PO Box 25720 - Silverthorne, CO 80498

phone 970.513.0777 | fax 970.513.0770

mobile 970.418.1022 | website RJBdevelopment.com



1

**EXHIBIT**

**2**

| | |
|---|---|
| DISTRICT COURT<br>SUMMIT COUNTY, COLORADO<br>501 North Park Avenue<br>PO Box 269, Breckenridge, CO 80424<br>970-453-2241 | DATE FILED: June 1, 2018 3:27 PM<br>CASE NUMBER: 2014CV30297 |
| **Plaintiffs:** JAMES M. RALLO, an individual, and<br>KIMBERLY P. RALLO, an individual<br><br>v.<br><br>**Defendants and Counterclaim Plaintiffs:**<br>RJB DEVELOPMENT, INC., a Colorado corporation;<br>RANDY BARRIENTEZ, an individual; RANGE WEST<br>INC., a Colorado corporation; ORR CONCRETE, INC., a<br>Colorado corporation; SCOTT ORR, an individual; BAY<br>CONSTRUCTION, INC.,  a Colorado corporation; MARK<br>BODHAN, an individual<br><br>v.<br><br>**Counterclaim Defendants:**<br>JAMES M. RALLO, an individual; KIMBERLY P. RALLO,<br>an individual; ASTILLA'S TILE LLC, a Colorado limited<br>liability company; BRENT IVES, an individual; BANK OF<br>AMERICA, N.A., a national banking association<br><br>And:<br><br>**Plaintiff:** JAMES M. RALLO<br><br>v.<br><br>**Defendant:** WILLIAM WILKINSON<br><br>v.<br><br>**Third Party Defendant:** RJB DEVELOPMENT, INC. | ▲ COURT USE ONLY ▲ |
| | Case Number:  2014CV30297<br>Consolidated with 2015C30307<br><br>Div.:   T      Courtroom:  3 |
| **FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT** | |

THIS MATTER came before the court for trial to the court on January 18-20, 2017, March 20-22, 2017, and April 26, 2017, and the court having considered the evidence makes the following findings of fact, conclusions of law, and judgment:

## I.  Introduction

This action arises out of construction of a custom home in Breckenridge, Colorado.  The general contractor and homeowners agreed that the home would be built for the cost construction and a contractor's fee, but for a price not to exceed $2,127,520.  Construction started in the summer of 2013 and after some delays caused by unexpected groundwater, the homeowners and general contractor agreed that the home would be completed by May 15, 2014.  A certificate of occupancy was obtained for the house on December 22, 2014, and this suit was filed the same day.  The parties had substantial disagreements over responsibility for the cost of the work, including disputes over change orders and responsibility for the delay in completion, and nonpayment.

The general contractor filed a mechanic's lien alleging nonpayment and the homeowners' claims were amended in March of 2015 to expand the allegations supporting the claims for defects in construction and to include several additional subcontractors and their principals as defendants.  The general contractor brought claims for breach of contract and foreclosure of its lien.  The claims for defects in construction were separated from the contact claims between the homeowners and the general contractor.  Some of the defect claims were resolved by settlement and others were dismissed by the court.  A trial to the court was held to resolve the mechanic's lien and contract related claims, as well as a claim between one of the homeowners and an electrical subcontractor.  This order resolves the remaining payment related claims pending before the court at the bench trial in favor of the homeowners.

## II.    Parties, Jurisdiction, Procedural Background, and Claims for Resolution

### A.    Pleadings, Parties and Jurisdiction

Plaintiffs and counterclaim defendants James M. Rallo and Kimberly P. Rallo (the "Rallos"), are residents of Maryland and jointly owned certain real property legally described as Lot 7, First Amended Plat, Trappers Glen Subdivision Filings 1, 2 and 3, according to the plat filed March 19, 1996, at Reception No. 517871, Summit County, Colorado, and commonly known as 1030 Four O'Clock Road, Breckenridge, Colorado (the "Property").   During the course of these proceedings the Rallos divorced and James Rallo became the sole owner.[1]

The Rallos entered into a *Construction Contract between Owner and Contractor (Cost Plus with a Guaranteed Maximum Price)*, dated August 9, 2013 (the "Contract"), with defendant and counterclaim plaintiff RJB Development, Inc. ("RJB"), whereby RJB agreed to construct a custom single family home on the Property.   RJB is a Colorado corporation with a business address in Silverthorne, Colorado.   Defendant Randy Barrientez is a principal of RJB.   The Contract includes a personal guaranty by Randy Barrientez.

The Rallos filed their initial Complaint against RJB and Randy Barrientez on December 22, 2014, the same day the certificate of occupancy issued for the house.   The Complaint alleged defects in workmanship in support of claims for breach of contract and negligence.   RJB and Randy Barrientez were served with the Complaint on January 6, 2015.   On March 3, 2015, an Amended Complaint was filed which raised new factual allegations including that RJB breached the Contract by failing to pay subcontractors.

---

[1]      Kimberly Rallo has not been an active participant in this action and did not appear or testify at trial.  Earlier in the proceedings, plaintiffs sought to "substitute" Mr. Rallo for Kimberly Rallo but the request was denied by the court.  See Order Re Motion to Substitute, dated June 6, 2016.  Ms. Rallo remains a party, and, in particular, a defendant with respect to the counterclaims of RJB.   In light of the evidence, and notwithstanding her failure to appear, the court finds no appropriate basis for entry of default against Ms. Rallo.   There is no assignment of claims of record nor is the decree from the Rallos' divorce in evidence.  As such, the judgment entered herein is in favor of the Rallos and the court leaves the Rallos' ownership of the claims and/or judgment and proceeds to the terms fo the Rallos' dissolution of marriage proceedings.

Additionally, the Amended Complaint identified several subcontractors on the Project as additional defendants, including the Project's surveyor Range West, Inc., and Robert Johns (collectively "Range West"), a concrete subcontractor Orr Concrete, Inc., and Scott Orr (collectively "Orr Concrete"), an excavating subcontractor Aichholz Excavation Corp., and William T. Aichholz (collectively "Aichholz Excavation"), and a supervisor on the Project Mark Bodhan and his company Bay Construction, Inc. (collectively "Bodhan"). The Amended Complaint includes claims for breach of contract against RJB and Randy Barrientez, negligence against all of the defendants, and violation of the Colorado Contractor Trust Fund Statute and Civil Theft (C.R.S. § 38-22-127), and conversion against RJB and Randy Barrientez. The claims against Aichholz Excavation were dismissed early in the proceedings.

Defendants RJB and Randy Barrientez asserted cross claims against Range West, Orr Concrete, Aichholz Excavation, and Bodhan for breach of contract, contribution, and negligence, and counterclaims against the Rallos for breach of contract based on alleged non-payment of sums due under the Contract, unjust enrichment, and intentional interference with contracts for the Rallos alleged interference with RJB's subcontractors and suppliers. RJB subsequently amended its answer and counterclaims to foreclose its mechanic's lien. This resulted in the addition of two parties with record interests in the Property, Bank of America, N.A. ("BANA"), a lender to the Rallos, and Brett Ives ("Ives"), a subcontractor on the Project that filed a mechanic's lien. BANA responded to RJB's lien claims by asserting on several grounds that RJB's lien is invalid. Ives's claims were resolved prior to trial.

Mr. Rallo separately initiated a county court suit against William Wilkinson, an electrician that performed work on the Project. Wilkinson counterclaimed against Rallo and RJB alleging non-payment for the work he performed. The county court case involving Wilkinson, 2015C30307, was consolidated with this action for trial.

It is uncontested and the court finds and concludes as a matter of law that it has jurisdiction over all of the claims and parties at issue and that venue is proper in Summit County.

B.     **The Defect Claims**

The Rallos' claims for negligence and, at least in part, for breach of contract are premised on alleged defects in construction of the Project.  The alleged defects include a concrete foundation wall constructed out of square with associated damages, incorrectly located columns supporting the porte cochere, failure to install copper piping to the kitchen, an improperly insulated and ventilated roof, failure to install a drainage plane behind the masonry, installation of different brand of housewrap, a damaged waterproof membrane below an exterior deck, an improperly constructed drain in a rear patio, and incomplete punch list and electrical work. See Plaintiffs' Initial List of Construction Defects, filed April 30, 2015; Amended Complaint, ¶¶ 31-42.   The Rallos mediated with RJB in October, 2015 and reached a written settlement agreement with respect to the Rallos' construction defect claims against RJB.  The settlement provided that RJB would pay the Rallos $100,000 in exchange for a release of the construction defect claims in the suit, but reserved the remaining non-defect claims. The Rallos subsequently disputed the scope of the settlement.   The court determined the settlement agreement to be enforceable. See Order re Defendants RJB Development, Inc., and Randy Barrientez's Motion to Enforce Settlement Agreement, dated March 23, 2016 ("Order Enforcing Settlement Agreement").

The Order Enforcing Settlement Agreement was not dispositive of the Rallos' negligence claims against Range West, Orr Concrete, and Bodhan.  At the request of the parties, the court bifurcated trial of all remaining claims, setting the negligence claims against the subcontractors for trial by jury in January 2017, with a trailing trial to the court to resolve the non-defect claims among the Rallos, BANA, RJB, and Wilkinson. As a consequence of a discovery sanction, the court dismissed the Rallos' negligence claims against Range West, Orr Concrete, and Bay Construction and vacated the jury trial. See Order re: Motion to Strike, Request for Sanctions, Request for Hearing and Request for Expedited Briefing Schedule, dated December 28, 2016.   The payment and

lien claims were then tried to the court on several days, spread over many months and finally concluding on April 27, 2017.

## C.     Payment and Lien Claims

Putting aside the construction defect claims, the remaining issues among the parties are fairly characterized as payment disputes falling into three broad categories: breach of contract, mechanic's lien claims, and violation of the statutory trust provisions of C.R.S. § 38-22-127 (2014).  In order to frame its discussion of the evidence presented at trial and more specific factual findings and conclusions of law, the court finds it appropriate to summarize the legal principles relating to the parties' claims.

### III.     Overview of Legal Principles and Claims for Resolution at Trial

## A.     Breach of Contract

To recover for a breach of contract, a plaintiff must prove by a preponderance of the evidence: (1) a contract exists; (2) the plaintiff performed its obligations under the contract or the plaintiff's nonperformance is justified; (3) the defendant failed to perform its obligations under the contract; and (4) the plaintiff suffered damages because of the defendant's failure to perform.  Western Distributing Co. v. Diodosio, 841 P.2d 1053, 1058-59 (Colo. 1992).  Performance under the second element means "substantial performance." Id. Substantial performance occurs only when the defendant has received "substantially the benefit he [or she] expected," and the plaintiff has deviated from the contract only in "trifling particulars not materially detracting from the benefit the other party would derive from a literal performance." Id. (quoting Newcomb v. Schaeffler, 131 Colo. 56, 62, 279 P.2d 409, 412 (1955)).

"'The measure of damages for breach of a construction contract is the sum which will put the damaged party in as good a position as it would have occupied if the contract had been performed.'" D.R. Horton, Inc.-Denver v. Bischof & Coffman Construction, LLC, 217 P.3d 1262, 1272 (Colo.App. 2009) (quoting Flanders Elec. Motor Service, Inv. v. Davall Controls & Engineering, 831 P.2d 492, 496 (Colo.App. 1992). From the owner's perspective, the measure of damages in breach of construction

contract cases where there has been substantial performance is the reasonable cost of completion plus any damages associated with the delay in completing the contract. Id., *citing* Flanders Elec. Motor Service, 831 P.2d at 496; General Ins. Co. v. City of Colorado Springs, 638 P.2d 752, 759 (Colo.1981) ("Where a breach results in unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, the injured party may recover damages based on '(a) the diminution in the market price of the property caused by the breach, or (b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him.' " (quoting Restatement (Second) of Contracts § 348(2)).

B.     **Mechanic's Liens**

Colorado mechanics liens are creatures of statute. *See* C.R.S. § 38–22–101, *et seq*. As a general matter, the premise of the Colorado mechanics lien law is that one who has enhanced the value of particular real property or improvements by his labor or materials, if unpaid, should be secured by the property he helped improve. The basic elements of a Colorado mechanics lien are four: (1) supplying work or materials of the kind specified in the statute; (2) for the benefit of specific real property or improvements; (3) at the request of the property owner or one authorized by him; and (4) compliance with statutory procedures for perfection and enforcement of the lien. *See* C.R.S. §§ 38-22-101, 109 and 110 (2014); Thirteenth St. Corp. v. A–1 Plumbing and Heating Co., 640 P.2d 1130, 1134 (Colo.1982) (any work to be entitled to a mechanics lien must be work of a nature that may improve or enhance the value of real property or real property improvements). A lien claimant may foreclose his lien and be entitled to priority. *See* C.R.S. §§ 38-22-106 (priority of lien attachments) and 38-22-113.

A lien claimant forfeits a lien filed for an amount greater than is due without a reasonable possibility said amount claimed is due, and is also liable for the costs and attorney's fees of the person against whom the lien was filed. C.R.S. § 38-22-128 (2014). "One asserting that a lien is excessive must prove, not only that the lien amount exceeds the amount actually due, but also that there was no reasonable possibility that it was

due and that the lien claimant knew that the lien amount was greater than the amount due." <u>Honnen Equip. Co. v. Never Summer Backhoe Serv., Inc.</u>, 261 P.3d 507, 510 (Colo. App. 2011).

**C.      Trust Fund Statute**

The Colorado's mechanics lien statute also creates a trust obligation with respect to funds disbursed to contractors on construction projects.   Section 18-22-127, C.R.S., commonly referred to as the "Trust Fund Statute," provides:

> All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contractor on any construction project shall be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor, who have a lien, or may have a lien, against the property, or who claim, or may claim, against a principal and surety under the provisions of this article and for which such disbursement was made.

C.R.S. § 38-22-127(1)(2014); *see*  <u>Yale v. AC Excavating, Inc.</u>, 295 P.3d 470, 475 (Colo.App. 2013).   The Trust Fund Statute imposes duties on contractors to ensure that subcontractors are paid, and is designed to protect homeowners, laborers, and materials suppliers from dishonest contractors. <u>Flooring Design Associates, Inc. v. Novik</u>, 923 P.2d 216, 219 (Colo.App. 1995).   Colorado courts have recognized this statutory trust, and, subsection 127(5) provides that violation of subsection (1) and (2) of section 127 is theft as defined in C.R.S. § 18-4-401. *See* C.R.S. § 38-22-127(5)(2014).   The owner of the property may enforce the statutory trust. <u>Syfrett v. Pullen</u>, 209 P.3d 1167, 1171 (Colo.App. 2008).   A contractor breaches the statutory trust relationship by diverting trust from the suppliers and laborers on a project to other obligations. *See* <u>AC Excavating, Inc. v. Yale</u>, 297 P.3d 937, 939 (ColoApp. 2010) *rev'd on other grounds* 295 P.3d 470 (Colo. 2013); *see* <u>In re Gamboa</u>, 400 B.R. 784, 790 (Bankr.D. Colo. 2008).   An owner of property taken by theft may recover treble damages, costs, and reasonable attorney fees from the taker. <u>Yale</u>, 295 P.3d at 479.

D.     **Claims and Trial**

1.     **Claims**

A "Proposed Bench Trial Management Order" was submitted by the Rallos on January 6, 2017, and reflects a summary of the claims for adjudication by trial to the court. The Rallos assert claims against RJB and Barrientez for breach of contract, violation of the Trust Fund Statute (a statutory claim and civil theft claim), and conversion. Mr. Rallo asserts a claim for breach of contract against Wilkinson. The Rallos also asserted all of the affirmative defenses alleged in their pleadings, excepting those relating to negligence. The Rallos seek damages for delay and for the cost of completion of the Project, treble damages for violation of the Trust Fund Statute, and attorney's fees and costs, both under the contract and by statute, against RJB and Barrientez. The Rallos also seek a declaration that RJB's lien is excessive and therefore void and for an award of attorney's fees and costs for defending against the lien.

Mr. Rallo seeks damages for breach of contract from Wilkinson both to recover money paid and for the cost of completing Wilkinson's work. Conversely, Wilkinson asserts an unjust enrichment claim against Mr. Rallo.

RJB asserts claims for breach of contract, foreclosure of its mechanics' lien, unjust enrichment, and tortious interference with contract against the Rallos. RJB asserted all of the affirmative defenses alleged in its pleadings.

BANA did not make any independently substantive claims, but asserts it is entitled to an award of attorney's fees and costs incurred in defending against RJB's lien under C.R.S. § 38-22-128 (2014). BANA asserts that RJB's lien is knowingly overstated, and that RJB must meet its burden of proof to show priority of its lien by showing that the lien was timely filed and that all conditions precedent to enforcement of the lien against the Property were satisfied. BANA also asserted, by way of setoff, that if RJB's lien is not overstated, then RJB must provide the amounts claimed due and owing are in fact due and owing. In sum, BANA seeks relief in the form a determination of the timeliness and validity of the RJB lien and an award of attorney's fees and costs.

2.      **Trial**

The trial to the court in this matter was conducted January 18-20, 2017, March 20-22, 2017, and April 26, 2017.   The Rallos, RJB, and BANA submitted revised proposed orders to the court after trial.   At trial, the court heard testimony from James Rallo, Randy Barrientez, and William Wilkinson.   Additionally, the court heard testimony from Marrand Barrientez on behalf of RJB, and several subcontractors: Bernobe Verdugo, Sophie Willemsen, Luis Gonzales, George Musina, Luis Guttierrez, Alex Johnson, Brett Ives, David Nelson, Denise Roberts, Don Anderson, Nick Webber, Virgil Best, Mark Bodhan, and Marc Hogan.   In lieu of testimony, the court received the transcript of the deposition of Javier Mendoza into evidence by stipulation because Mr. Mendoza was unavailable to testify at trial as a result of his incarceration.   In addition to the testimony, the court admitted more than a thousand pages of exhibits as identified in the post-trial Joint Exhibit List filed on April 21, 2017.

The court has carefully considered all of the testimony and documentary evidence presented, the parties' proposed orders, trial briefs, and closing arguments, and the findings of fact set forth throughout this Order are made by a preponderance of the evidence and based upon the court's determination of the weight, credibility, and probative force of each component of the evidence.

## IV.      Findings of Fact and Conclusions of Law

A.      **Timeline**

Work began on the Project in mid-July, 2013.   Groundwater was unexpectedly encountered during the initial excavation.   A subsurface drainage and foundation plan was engineered and installed, resulting in a 19 day delay in the Project. *See* Ex. J29 (Construction Schedule, Line 10).   It is undisputed that following the subsurface water event, RJB and the Rallos renegotiated their arrangement concerning the Project and

executed the Contract effective August 9, 2013, and with a date for substantial completion of May 15, 2014.[2]

After the drainage and related foundation issues were addressed, construction of the foundation began.  Not long after the concrete foundation walls and at-grade slab were poured it was discovered that the foundation wall along the western side of the home was poured out of square such that the western-most corner of the foundation was approximately 10 inches too far to the southeast.  Because the plumber used the foundation wall as a reference point for installing the underground plumbing beneath the slab in that part of the home, some of the slab penetrations (e.g. hydronic heating manifold) were incorrectly located.  Additionally, some of the locations for columns were not properly centered to the corresponding footings and a step in the slab was incorrectly located.   In light of the anticipated delay, expense and impracticality of removing and reinstalling the out of square portion foundation wall, RJB, with the assistance of the architect and the approval and agreement of the Rallos, devised and implemented a solution that included cutting the slab and relocating the affected plumbing, furring out the walls (in some areas to a larger extent than would otherwise have been required) in the affected interior spaces, and adding some additional exterior stone work to improve aesthetics at that corner of the home.   The Project was delayed for six days to the make the corrections necessitated by the wall being out of square.

Construction continued through the winter of 2013-14.  On the scheduled completion date of May 15, 2014, the home was only about sixty percent complete as reflected in the payment requests.  The Town of Breckenridge issued a Certificate of Occupancy for the Project on December 22, 2014. Mr. Rallo took possession of the house that day to host his family for the Christmas holiday.

From August 23, 2013, to November 20, 2014, RJB submitted fourteen payment requests to the Rallos.  These first fourteen payment requests included twelve change orders.  It is undisputed that the Rallos paid the first fourteen payment requests,

---

[2]      The subsurface water issue caused a substantial increase in construction costs that was addressed by the parties and paid for by the Rallos and not material to the disputes at issue for trial.

including the change orders, in full.   RJB submitted a fifteenth payment request to the
Rallos on December 23, 2014, one day after issuance of the Certificate of Occupancy.
The Rallos paid a portion of RJB's fifteenth payment request and withheld a portion
based upon the delay in completion and deficiencies in construction.   It is undisputed
that the Rallos paid RJB $1,994,384.16 against RJB's first fifteen payment requests.

In January, 2015, RJB submitted a sixteenth payment request to the Rallos.   In
February, 2015, RJB submitted a seventeenth payment request to the Rallos, along with
thirty (30) additional change orders (numbered 13-43).   Following the partial payment
on the fifteenth pay request in December, 2014, the Rallos did not make any further
direct payments to RJB.   RJB contends that the Rallos unilaterally terminated RJB
without cause and in breach of the Contract.   Mr. Rallo paid a number of
subcontractors directly, after the last partial payment was made on Draw 15.   RJB
contends these direct payments constitute unlawful interference with RJB's relationship
to its subcontractors.

RJB recorded a mechanics lien against the Property on May 26, 2015, in the real
property records for Summit County, Colorado, claiming an amount due of $232,635.52
(the "Lien").   See Ex. J28.   RJB mailed a Notice of its Intent to File Lien Statement more
than ten days prior to recording its Lien.   BANA claims an interest in the Property by
virtue of a Deed of Trust for the amount of $1,000,000 given for the benefit of BANA
and the Public Trustee of Summit County, dated April 20, 2015, and recorded in the
records of the Summit County Clerk and Recorder on June 2, 2015, at Reception No.
1083537 ("Deed of Trust").

Wilkinson, doing business as High Energy Electric, was initially a subcontractor
of RJB on the Project.   In February, 2015, Mr. Rallo began working directly with
Wilkinson and ultimately Mr. Rallo and Wilkinson entered into an oral agreement on or
about February 17, 2015.   The relationship quickly broke down and Wilkinson refused
to perform additional work on the Project.   Wilkinson seeks unpaid amounts which he
alleges are due from both RJB and Mr. Rallo.   For his part, Mr. Rallo contends he is
entitled to a refund for amounts paid, as well as for amounts he expended to complete

Wilkinson's work.  Because the evidence relating to Wilkinson is largely separate from the claims between RJB and the Rallos, the court addresses the Wilkinson claims separately in section IV.F. below.

**B.     The Contract**

The Contract provides generally that RJB as the "Contractor" will complete the "Contract Work" within the "Contract Time" in exchange for payment of the "Contract Sum" by the Rallos as the "Owner". *See* Ex. J1 (Contract). The Contract requires the Rallos pay the cost of construction incurred by RJB, together with a percentage of the cost as a contractor's fee, but subject to a guaranteed maximum price of $2,127,520 ("GMP").  The GMP is premised on a Cost Control Estimate setting forth an itemized estimate for the various categories of cost necessary to complete the Project, including an owner's allowance budget of $467,707. *See* Ex. J3 (Cost Control Estimate). The Contract provides for a ten month construction period commencing with excavation on July 15, 2013, and ending with "Substantial Completion" by May 14, 2014.

**1.   The Work**

Article 02 of the Contract defines the "Contract Work" as follows: CONTRACTOR shall supply and furnish all labor, materials, tools, supplies, equipment, machinery, transportation, supervision, insurance, taxes, services and other items required to complete and shall complete the following Work:  Construction of a new residential dwelling at 1030 Four-O'Clock-Road in Breckenridge CO.

*See* Ex. J1.  The Contract incorporates the architectural and structural plans and specifications for the residence (collectively the "Plans"). *See* Exs. A and 112.  The Plans depict a custom designed 8000+ square foot wood framed home.  Despite a variety of requirements relating to the architect in the specifications, the Project architect was not actively involved in the regular administration of the Contract or oversight of the Project.

2.  **Contract Time**

With respect to Contract Time, the Contract initially incorporates the "General

Contractor schedule Dated 06/20/2013" as one of the Contract Documents. *See* Ex. J1

Article 01; Ex. 71 (General Contractor schedule Dated 06/20/2013).   The June 20, 2013,

schedule provides for completion and occupancy by April 17, 2014. *See* Ex. 71

(06/20/2013 Schedule, Line 108).   Notwithstanding the incorporation of the June 20,

2013, schedule, the Contract more specifically provides in Article 03 Contract Time as

follows:

> CONTRACTOR'S Work shall be substantially completed by May 15th,
> 2014. 'Substantial Completion' shall be defined as the state in the progress
> of the work when the work is sufficiently complete so that the OWNER
> can legally occupy or use the Residence.
>
> Time is of the essence of this Contract.   If the Commencement Date for
> CONTRACTOR'S Work is delayed through no act or fault of
> CONTRACTOR, the Substantial Completion Date shall be extended by
> the same number of days as the delay.

Ex. J1, Article 03.  The Commencement Date in the Contract is July 15, 2013, which is

when work started prior to the discovery of the groundwater and execution of the

Contract.  RJB seems to take the position that the delay resulting from the groundwater

mitigation caused a delay to the Project schedule and contributed to the Project being

seven months behind at the time the Certificate of Occupancy was issued in December,

2014.  This argument is not supported by the evidence.

The Contract is dated August 9, 2013, and specifies the date certain of May 15,

2014, for completion.  Five months after the date of the Contract, RJB produced a

schedule in January, 2014, showing a 19 day delay for water mitigation that began on

July 18, 2013 and ended August 13, 2013, and which projects receipt of a Certificate of

Occupancy on May 15, 2014, as required by the Contract. *See* Ex. J29 (Schedule, Line 101

– Certificate of Occupancy by May 15, 2014, and Line 109 Occupancy by May 20, 2014).

In other words, the evidence supports the conclusion that RJB had already accounted

for the delay and scheduling impacts (including a shift in portions of the work closer to

and into the winter months) caused by the groundwater mitigation work when it contractually obligated itself to attain substantial completion by May 15, 2014. Consequently, and as more fully discussed below, RJB's persistent reliance on the groundwater event to explain delay in completion of the Project is misplaced.

The date for substantial completion takes on greater importance with respect to both change orders and the payment obligations of the Rallos when viewed in the context of the remainder of Article 03 which provides in pertinent part as follows:

> If CONTRACTOR'S Work is delayed by any change in the Work, by labor dispute, fire, unusual delay in deliver, adverse weather conditions, unavoidable casualty delays incurred due to the failure of OWNER to make time decisions under the contract or any other cause beyond CONTRACTOR'S control, the Contract Time shall be extended by Change Order is accordance with Article 5.   In the case of a continuing cause of delay only one claim is necessary.

> Contractor shall receive a $10,000 bonus payment if the Certificate of Occupancy (CO) is obtained and Substantial Completion is achieved by March 15, 2014.

> Contractor shall Pay Owner in the form of a credit to the next scheduled draw $10,000 for each 30 day period after May 15th, 2014.

Ex. J1, Article 03 (emphasis added).

### 3. Contract Sum and Progress Payments

The Contract Sum is to be paid by the Rallos over the course of the Project through regular progress payments and based upon draw requests submitted by RJB.[3] The Contract provides the following process at Article 13 for the submission of requests for payment by RJB on the Project:

> OWNER shall make progress payments in proportion to the Work completed during the construction process. CONTRACTOR shall submit

---

[3]      Unlike some construction projects, the Rallos' lender BANA was not involved in administration or payment of the draw requests on the Project.  All of RJB's payment requests to the Rallos were submitted directly to the Rallos and processed and paid out by Mr. Rallo.

> to OWNER a written Draw. Draws shall be itemized showing the Cost of the Work and CONTRACTOR'S Fee for each item included In the Draw, and shall include supporting invoices, receipts or other documentation evidencing the Cost of the Work, as well as a lien waivers in a form acceptable to Owner for that portion of the Work completed during the previous paid payment application.

Ex. J1. As noted above, RJB submitted seventeen sequentially numbered Draws to the Rallos relating to the Project. *See* Exs. J4 (Draw 1) to J20 (Draw 17).   Each of the Draws is comprised of five parts.  The first part of each Draw is a two or three page spreadsheet captioned "Payment and Draw Summary" which summarizes the amounts previously requested and paid on prior Draws and the amount of the current Draw request. *See, e.g.* Ex. J15 (Draw 12), pp. RJB001176-77.   The second part is a "Draw Overview" which is a spreadsheet tracking payments from each of the Draws against the Construction Cost Estimate by line item.  *See, e.g.* Ex. J15 (Draw 12), pp. RJB001178-86 CCE.[4]  The third part is a "Draw Coversheet" indicating amounts being requested in the Draw for payments to specific vendors for the Cost of the Work (i.e. subcontractors and/or material suppliers).[5] *See, e.g.* Ex. J15 (Draw 12), pp. RJB001187.   The fourth part is comprised of supporting documentation for each item of "Cost" identified on the Draw Coversheet, such as invoices, statements, and receipts.  Each item of support is preceded by a sheet titled "Request for Payment" summarizing the requested Cost item. *See, e.g.* Ex. J15 (Draw 12), pp. RJB001188-1216.   Finally, the fifth part is comprised of executed lien waivers covering work done under the preceding paid Draw. *See, e.g.* Ex. J15 (Draw 12), pp. RJB001217-1221.

---

[4]      The Contract also contains a detailed provision concerning "Cost Control and Tracking" so as to tie together the GMP and Cost of the Work and the contractor's fee to ensure the GMP is not exceeded, subject to additions and deductions by change order. *See* J1, Article 04.C.

[5]      The Cost of the Work is defined in detail in Article 04.A. of the Contract.  Said provision also describes costs that are not to be reimbursed, including, without limitation, RJB's capital expenses, office expenses, overhead and general expenses, and any costs that would cause the GMP to be exceeded. Ex. J1, Article 04.B.

4. **Change Orders**

The Contract also includes a change order process whereby the parties may modify Contract Sum and/or Contract Time.  Article 05 provides as follows:

> CONTRACTOR may be ordered by written Change Order, signed by OWNER and CONTRACTOR, to make changes in the Work within the scope of this Contract consisting of additions, deletions or other revisions, the Contract Sum, including CONTRACTOR'S Fee, and Contract Time being adjusted accordingly.

> CONTRACTOR shall additionally be entitled to an adjustment in the Contract Sum, including CONTRACTOR'S Fee, Supervision Fee and Contract Time as a result of deficiencies in the Plans and Specifications; or subsurface or concealed physical conditions materially different from those indicated in the Contract Documents or unknown significant physical conditions of an unusual material nature encountered at the project, such as a 20 ton boulder. OWNER EXPRESSLY ACKNOWLEDGES THAT, IN ADDITION TO ANY OTHER CHANGE ORDERS DESCRIBED IN THIS ARTICLE, ANY AND ALL COSTS EXCEEDING ANY ALLOWANCE ITEM SET FOR IN THE ATTACHED COST CONTROL ESTIMATE WILL RESULT IN A CHANGE ORDER INCREASING THE GUARANTEED MAXIMUM PRICE OF THIS CONTRACT BY THE AMOUNT ABOVE THE LINE ITEM ALLOWANCE.

> CONTRACTOR shall make all claims to OWNER for additional cost, extensions of time and damages for delays or other causes at the time such claims are identified and in accordance with the Contract Documents.

Ex. J1, Contract, Article 05.   In plain terms, the Contract provides a process whereby change orders are to be submitted and approved contemporaneous to the actual change in project scope so as to adjust the scope of the Work, the Cost of the Work (including any necessary adjustment to the GMP), and the Contract Time, or any combination thereof necessitated by the actual change.  RJB submitted twelve Change Orders prior to issuance of the Certificate of Occupancy and in conjunction with the Draws. *See* Ex. J21. These change orders, 1 – 12, were paid by the Rallos in conjunction with Draws 1 – 14. In February, 2015, RJB submitted thirty additional Change Orders purportedly in support of changes to the Work requested by the Rallos and supporting both increase in

the GMP and 131 day expansion of the Contract Time.   The Rallos dispute the validity of Change Orders 13-43.

**C.    The Trust Fund Statute, Civil Theft and Conversion**

**1.   The Court's Prior Ruling**

Prior to trial the Rallos moved for summary judgment on their claims for violation of the Trust Fund Statute and civil theft and conversion.   The court denied the motion and found that the Contract "does not provide for the earmarking of funds for disbursement to any particular subcontractor and/or supplier by RJB".   *See* Order Denying Plaintiffs' Motion for Summary Judgment, dated November 9, 2016; *see also* In re Gamboa, 400 B.R. 784, 791-92 (Bankr.D. Colo. 2008).   The court then went on to find the Rallos had not met their initial burden on summary judgment.   After reviewing the evidence at trial, considering the differing burden of proof and standard of review between trial and summary judgment, and closely examining the language of the Contract and C.R.S. § 18-22-127, and  the related case law, the court is compelled to revisit its prior determination. *See* City of Aurora v. Allen, 885 P.2d 207, 212 (Colo. 1994) (law of the case doctrine does not prevent a trial court from revisiting its prior rulings and modifying or rescinding the same on proper grounds).

The primary goal of contract interpretation is to determine and give effect to the intent of the parties. Ad Two, Inc. v. City & Cty. of Denver ex rel. Manager of Aviation, 9 P.3d 373, 376 (Colo. 2000).  The intent of the parties to a contract is to be determined primarily from the language of the instrument itself. Id.  In ascertaining whether certain provisions of an agreement are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed. Id.  Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language. Id.  Here, neither party contends that any particular provision is ambiguous.   Rather, the parties disagree as to how the Contract, as a whole, should be construed within the context of the Trust Fund Statute.

The Trust Fund Statute imposes an accounting obligation on a contractor:

> Every contractor or subcontractor shall maintain separate records of
> account for each project or contract, but nothing contained in this section
> shall be construed as requiring a contractor or subcontractor to deposit
> trust funds from a single project in a separate bank account solely for that
> project so long as trust funds are not expended in a manner prohibited by
> this section.

C.R.S. § 38–22–127(4).  Thus, the duty to account rests with the contractor to
whom payments are made. Id.; *see also* Gamboa, 400 B.R. at 789-90.
Harmonizing the duty to account in subsection 129(4) with the trust obligation in
subsection 129(1), the contractor must be able to account for the funds disbursed
by showing that the funds have been paid over to the subcontractors, laborers, or
material suppliers "who **have** furnished laborers, materials, services, or labor,
who have a lien, or may have a lien . . . **and for which such disbursement was
made**." C.R.S. § 38-22-127(1) (emphasis added).   Thus, as a matter of law, the
contractor may account for the disbursements in only one of three ways:

> (1) by demonstrating payment to the claimant (*see* People v. Erickson, 695
> P.2d 804, 805-06 (Colo.App. 1984) (evidence that all funds received were
> disbursed provides as defense under the Trust Fund Statute));

> (2) by holding the funds in trust and not disbursing them for any other
> purpose (*see* Gamboa, 400 B.R. at 791); or

> (3)  withholding payment under the safe harbor provisions of C.R.S. § 38-
> 22-127(2) which provide for the defenses of set-off or good faith belief of
> invalidity of the claim (*see generally* Western Distrib. V. Diodosio, 841 P.2d
> 1053, 1057 (Colo. 1992)).

Within this framework, the bankruptcy court in Gamboa determined that all
payments on a project are to be treated as a single pot of funds and that the timing of
the work does not matter, absent an earmarking of funds, so long as no funds are
disbursed to the general contractor for any purpose until all subcontractors and vendors
on the project are paid. 400 B.R. at 790-92.   The bankruptcy court in Gamboa did not

elaborate on the terms of the contract at issue in that case, nor did it offer any explanation of what might constitute an "earmarking" of funds.   At summary judgment and trial, RJB argued that all of the payments it received from the Rallos are to be treated as a single pot of funds, that the Contract does not require disbursements to any particular subcontractors or materials suppliers, and that, so long as it paid all of the funds disbursed by the Rallos into the Project, it could not be liable under the Trust Fund Statute.   For the reasons more fully set forth below, the court disagrees with this construction of the Contract and finds that when considered as a whole, the plain language necessarily requires an earmarking of the funds disbursed by the Rallos. *See* E-470 Pub. Highway Authority v. Jagow, 30 P.3d 798, 801 (Colo. App. 2001), *aff'd*, 49 P.3d 1151 (Colo. 2002) (In construing a contract, the court  is required to consider the subject matter of the contract, the object of making it, the sense in which the parties naturally understood it at the time it was made, and the parties' purposes and objects). Earmarking simply means to designate something, typically funds or resources, for a particular purpose.   Here, the Contract, in a manner consistent with the Trust Fund Statute, requires payment and disbursement for each specific item of the Cost of the Work in a particular time frame and for progress payments to RJB prior to completion of the Project, and does not treat the disbursements as a single pot of funds.

The Contract is a cost-plus arrangement whereby RJB earns a fee as a percentage of the Cost of the Work subject to the GMP. Ex. J1, Article 04 (Contractor's Fee of 4% of Cost of Work).   The Contract includes detailed provisions concerning "Cost Control and Tracking" which require, among other things, that each line item of a draw request clearly specify the associated cost. *See* Ex. J1, Article 04 and Article 13.   The Contract also provides for regular "Progress Payments", including for payments to RJB for the Contractor's Fee earned on the associated Cost of Work. Id.   Read together, these provisions allow the Rallos and RJB to regularly monitor the Cost of the Work against the Cost Control Estimate to ensure adherence to the GMP while also providing a mechanism to permit RJB to charge for and receive a portion of its Contractor Fee and other costs from the disbursement of funds on each Draw sequentially over the course

of the Project.  Ex. J1, Articles 04.C. and 13.   By the terms of the Contract, RJB is to submit each Draw with an itemization of the Cost of the Work and the Contractor's Fee for "each item included in the Draw Request".  Ex. J1, Article 13.  The Contract further provides that in each successive Draw, RJB is to supply a lien waiver for the disbursements on the preceding Draw "for that portion of the Work completed during the previous paid payment application." Id., Article 13 (emphasis added).  In other words, under the Contract, funds are requested and disbursed for designated items of the Cost of the Work during a set period of time and for the particular purpose of paying for each such item of the Cost of Work provided during the set period of time. See C.R.S. § 38-22-127(1) (funds paid to subcontractors and suppliers "who have furnished . . . . and for which such disbursement was made.")

In practice, the evidence shows that RJB prepared and supplied Draws to the Rallos with a Payment and Draw Summary, Draw Overview, Draw Cover Sheet, back up documents, and lien waivers corresponding to the preceding draw, and that all of this information identified payment requests by RJB for payment of specific amounts to specific subcontractors and suppliers for specific work and materials that had been furnished to the Project through a particular time period. See C.R.S. § 38-22-127(1) (contractor must be able to account for funds paid to subcontractors and materials suppliers "who have furnished . . . and for which such disbursement was made.") Taken together, the system of cost tracking embodied in the Contract, Draws, and associated cost control documents compels the conclusion that RJB was required to pay the subcontractors and materials suppliers for the Cost of Work specifically referenced in each Draw in accordance with the Draw for each successive time period until substantial completion and final payment. In other words, each line item in a Draw request operates to "earmark" the funds both for purposes of disbursement by the Rallos and payment by RJB for a specific time period.   To hold otherwise would render the provision requiring lien waivers for each preceding period meaningless.

The court also finds this construction of the contract consistent with the Trust Fund Statute's requirements and the parties' contractual intent. As emphasized above,

subsection 127(1) is written in the past tense with respect to disbursements being made for subcontractors, laborers, or materials suppliers who "have" provided labor or materials. Further, subsection 127(1) concludes with the qualifying phrase "and for which such disbursement was made." None of this language is ambiguous and, distilling it to its simplest form, the statute provides that the funds to be held in trust by the contractor are those disbursed to it for the purpose of paying the subcontractors and material suppliers that have already furnished labor or material. Thus, under the statute, the purpose of the owner's disbursement to the contractor is tied directly to the subcontractor or supplier that *has* provided labor or material during a particular time period. It is equally clear that under the statute a contractor cannot pay itself a penny until disbursements to the subcontractors and materials suppliers are paid (or properly withheld under the safe harbor of subsection 127(2)). There is no question that RJB and the Rallos agreed in the Contract that RJB could earn and make progress payment requests for and receive the Contractor Fee on each Draw over the course and **before** completion of the Project. If the Contract is not interpreted as earmarking the Rallos' disbursements, neither party could accurately track the GMP. Furthermore, RJB would be unable to pay itself through the progress payments in a manner consistent with the Trust Fund Statute's mandate that funds not be disbursed to the contractor where any subcontractor remains unpaid (i.e. RJB would have to remain unpaid until Project completion and payment of all subcontractors and suppliers). These results are plainly antithetical to the parties' contractual intent.

Accordingly, the court finds and concludes as a matter of law that the Contract, when read in its entirety by its plain language and harmonizing all of its provisions, calls for an earmarking of the Rallos' disbursements such that RJB was required to pay the subcontractors and materials suppliers for the Cost of Work referenced in each Draw according to the Draw and for each successive time period encompassed by the Draws. Consequently, the court finds that RJB's position that it may treat all of the funds disbursed by the Rallos on the Project as a fund from which subcontractors and suppliers may be paid as deemed appropriate by RJB cannot be reconciled with and is

not permitted by the Contract. This conclusion compels the court to examine each successive draw on the Project both separately and in aggregate to determine whether the sums disbursed by the Rallos to RJB were properly expended into the Project.

### 2. Violations of the Trust Fund Statute in General

The owner has the burden of coming forward with evidence demonstrating that he has unpaid invoices from the project for which the general contractor received disbursements. Gamboa, 400 B.R. at 790. The owner may satisfy this burden by tendering evidence showing disbursements made by the owner corresponding with unpaid invoices. Id. The evidence is competent if it demonstrates that the general contractor received disbursements on the project on which subcontractors provided labor and materials but were not fully paid. Id. Once the owner has satisfied this burden of production, the burden shifts to the general contractor to show that all owner disbursements on the project were used to pay the general contractor's subcontractors and material suppliers. Id. Unless and until the general contractor's subcontractors and material suppliers are paid in full, the general contractor cannot use any of the owner's funds to pay its overhead, compensation, vendors on other projects, or to put them to any other use. Id. If the general contractor shows that all funds were disbursed to subcontractors and material suppliers, but it was still insufficient to pay them in full, then the general contractor faces no liability under the statute. Id.

### 3. The Accounting Evidence

The evidence at trial demonstrates that the Rallos have met their initial burden of showing that there are unpaid subcontractors and suppliers on the Project. The evidence also shows that RJB has been unable to properly account for all of the funds disbursed by the Rallos to it on the Project. More specifically, the court finds that RJB has violated the Trust Fund Statute by paying itself in preference to subcontractors and by its inability to show that all of the disbursed funds have been paid into the Project, all as more fully set forth herein below.

### a. Synopsis of Accounting Testimony

The substantial majority of the testimony at trial revolved around accounting for the payment of subcontractors and materials suppliers.  The Rallos relied primarily on the testimony of James Rallo, with corroborating testimony from subcontractors and materials suppliers.  RJB relied on the testimony of Randy Barrientez and his son Marrand Barrientez, the latter of whom was primarily responsible for bookkeeping on the Project.   As more fully explained in this Order, the court credits Mr. Rallo's testimony and finds the same to be both thorough and reliable, and finds the testimony of both Randy and Marrand Barrientez to be unreliable, inconsistent, and often lacking in credibility with respect to the accounting.

While superficially comprehensive, RJB's accounting was surprisingly disorganized and incomplete when examined in detail.  Both the Trust Fund Statute and the Contract impose clear accounting burdens on RJB as the contractor.  As early as February, 2015, RJB was unable to supply proper supporting documentation for its final two draw requests, Draw 16 and Draw 17, and many of the claimed change orders.  At trial RJB attempted to offer back up documentation for Draw 16, but the tardy discovery of the materials was inadequately explained and the court refused to admit the exhibits as a result of its late disclosure.  The lack of supporting documentation for Draw 16 is, in and of itself, some evidence of RJB's failure to comply with the Trust Fund Statute.  C.R.S. § 38-22-127(4).   The deficiencies in RJB's accounting, however, run far deeper than missing support for Draw 16.

The Rallos accounting relied primarily on Exhibit 99 which encapsulates Mr. Rallo's reconciliation of RJB's accounting.  During discovery, RJB produced a spreadsheet which was eventually referred to at trial as Exhibit II[6] and which purports to account for each line item in each Draw request by identifying the category of the Work from the Cost Control Estimate, the identity of the vendor/subcontractor, the

---

[6]      The testimony at trial made clear to the court that RJB's spreadsheet was a work in progress, even during trial, and that it contained errors and other inaccuracies and was being regularly updated over the course of the nearly two years following the last Draw request and trial.  The court ultimately admitted Exhibit II as a summary.

amount due, amount paid, and cross references to invoices, lien waivers, and evidence of payment (e.g. check numbers).   The documentary evidence admitted at trial included, without limitation, all of the Draw requests (including the back-up information and lien waivers), copies of checks, copies of lien waivers and supporting documents, and credit card statements. *See* Exs. J4-20, J27, J26, and MM.  From all of this documentation Mr. Rallo, by application of his training in accounting, performed what amounts to an audit of the Project by undertaking the difficult and time consuming process of tying out each item of the Cost of the Work claimed by RJB in the spreadsheet (Ex. II) to the source documents in order to verify payment.  This process involved a review and comparison of the supporting invoice, payment documentation, and lien waiver for each item of the Cost of the Work through Draws 1 through 17 in order to determine the accuracy of RJB's accounting.   At trial, Mr. Rallo convincingly testified about this reconciliation process and explained in detail the spreadsheet in Exhibit 99 which summarized his findings and the significant discrepancies in RJB's accounting.   He was also able to corroborate his testimony with specific reference to documentary evidence demonstrating the discrepancies.  Additionally, and as noted below, many of the discrepancies were further corroborated by testimony of vendors and subcontractors.  While RJB's witnesses disputed Mr. Rallo's conclusions, they were unable to support their testimony with documentary evidence.  Mr. Rallo's command over the details and inaccuracies in RJB's records and accounting was substantially greater than that of either Randy or Marrand Barrientez.

As noted above, during the discovery phase of the case, and even during trial, RJB offered multiple spreadsheets in an effort to reconcile the accounting for the Project. See Exs. 100, at 23-31; II; and OO (tendered and rejected).  RJB's Exhibit II shows that RJB paid less into the Project than was disbursed to it by the Rallos, which amounts to a prima facie showing that it had, by its own accounting, violated the Trust Fund Statute. *Compare* Ex. CC (RJB received $1,994,384.16 from the Rallos) and Ex. II (Total amount claimed paid by RJB of $1,984,048.96).   In an effort to remedy this obvious shortcoming, RJB offered testimony concerning several mistakes and oversights in Exhibit II.  The

court finds Exhibit II and the supporting testimony offered by RJB largely unreliable and unpersuasive.

It is a necessary predicate to liability under the Trust Fund Statute that the Rallos must have disbursed and RJB must have received funds.  It is undisputed that the Rallos paid Draws 1-14 in full and a portion of Draw 15.   RJB's accounting purports to show that it disbursed funds to various subcontractors and suppliers on Draws 1-16, and that it disbursed funds to one subcontractor on Draw 17.  RJB's own accounting records indicated that at least $35,000 was unpaid to subcontractors after it had received payment on Draw 14 and before the dispute with the Rallos came to head at Draw 15.  Mr. Rallo's reconciliation also reflects that many of the payments which RJB claims to have made on the Project cannot be verified.  Based upon the court's review and consideration of the accounting evidence, and within the context of the court's construction of the Contract and application of the Trust Fund Statute, the court finds that RJB violated the Trust Fund Statute by paying itself in preference, failing to pay subcontractors and materials suppliers, and by diverting funds from the Project (i.e. being unable to account for funds it claims were paid into the Project).   The court will address each category.

### b.  RJB Paid Itself in Preference

As previously discussed, RJB must pay each subcontractor or material supplier prior to paying itself with respect to each successive Draw.  The evidence shows that on Draws 1-6, the Rallos disbursed $871,132.33 to RJB, that $829,649.17[7] was paid out to subcontractors and suppliers, that RJB disbursed $39,741.16 to itself, and that no amounts remain due to any subcontractor or material supplier from these first six payment requests.  Thus, RJB did not violate the Trust Fund Statute by paying itself in

---

[7]     RGB withheld $1,742 from Range West in relation to the foundation wall.  There is a safe harbor for RGB with respect to this amount. See C.R.S. § 38-22-127(2); Western Distribution, 841 P.2d at 1057.  Range West made a claim for this amount, but did not appear at trial.  The court therefore finds Range West waived its claim and enters judgment against in by default.  The evidence is insufficient for the court to determine whether this amount should be credited to the Rallos.

preference to subcontractors and suppliers with respect to the first six payment requests and disbursements from the Rallos and has carried its burden in that respect.

Beginning with Draw 7, RJB paid itself while a subcontractor remained unpaid. *See* Ex. 99 ($1,520 unpaid to welding subcontractor). RJB did not adequately establish this payment was retained as a set-off or held in trust. Thus, RJB violated the Trust Fund Statute by paying itself in preference on Draw 7 in the amount of $1,520. There are no unpaid subcontractors and suppliers on Draws 8, 9 or 10. RJB requested from the Rallos, received, and disbursed $66,360.66 to itself on Draws 1-10, all but $1,520 of which was proper under the Contract and Trust Fund Statute.[8]

From and after Draw 11, the evidence shows that RJB improperly disbursed funds to itself in preference to subcontractors and materials suppliers that had provided labor and/or materials to the Project. On Draw 11, RJB disbursed $5,379.88 to itself while leaving subcontractors unpaid in the amount of $11,950.31. RJB continued disbursements to itself in Draws 12 and 13 in the total amount of $7,082.21, but leaving the subcontractors unpaid from Draw 11. This problem became more amplified on Draw 14 (it is undisputed that RJB was paid in full by the Rallos on Draws 1-14) where RJB paid itself $5,769.39 for profit on Draw 14 while leaving unpaid on that same Draw a long list of subcontractors totaling $21,337.72. *See* Ex. 99 and Ex. II. Thus, by the close of Draw 14, RJB had left subcontractors unpaid in the total amount of $33,288.03 on Draws 11-14, but had paid itself in full. The evidence is also that from funds received from the Rallos, RJB disbursed funds to itself on Draws 15, 16 and 17, notwithstanding that many contractors and suppliers remained unpaid. The court finds that RJB improperly paid itself in preference to subcontractors in the total amount of $30,061.58 and that this amount should have been held in trust for payment of subcontractors and materials suppliers under the terms of the Contract and the Trust Fund Statute.

---

[8]     It is a necessary corollary to the court's determination that the Contract calls for "earmarking" that RJB is not required to hold all of the funds due to it in trust until conclusion of the Project but rather to examine the accounts Draws successively.

In sum, the court finds and concludes as a matter of law that RJB improperly used funds that should have been held in trust to pay itself in preference to subcontractors and/or material suppliers and therefore violated the Trust Fund Statute.

### c.   Failure to Pay Subcontractors Disbursed Funds

In addition to the amounts improperly paid by RJB to itself as a preference, RJB did not disburse funds paid by the Rallos leaving certain subcontractors and materials providers unpaid.  The Rallos paid RJB's Draws 1-14 in full, including all funds requested by RJB to pay itself as well as those funds requested to pay the identified subcontractors and materials suppliers.[9]  RJB's own Exhibit II reflects more than $35,000 in amounts unpaid to subcontractors and materials suppliers on Draws 1-14.  Exhibit 99, in turn, shows $36,550.03 in unpaid subcontractors and materials suppliers on Draws 1-14.  The evidence shows $21,337.72 unpaid on Draw 14 alone.  Draw 11 reflects significant unpaid retainage for which funds were disbursed.

Speaking generally, retainage is a portion of an agreed upon contract price deliberately withheld until the specified work is substantially complete to assure that the performing contractor with satisfy its obligations.  RJB exercised retainage provisions with respect to some subcontractors on the Project.  In several instances, RJB requested that the Rallos disburse funds for payment of retainage to subcontractors, but RJB did not pay the subcontractor or otherwise account for those funds when received from the Rallos.  On Draw 11, RJB included requests for $8,747.67 in retainage for Aichholtz Excavation and $1,689.25 in retainage for Division 7.  The Rallos paid the requested amounts for retainage.  On Draw 14, RJB requested $3,736.14 in retainage for Orr Concrete, which amounts were again paid by the Rallos.  None of these amounts was paid to Aicholtz Excavation, Division 7, or Orr Concrete, and RJB offered no persuasive evidence at trial that the retainage was properly withheld.  Consequently, the court finds that RJB has failed to account for $14,173.06 disbursed by the Rallos for

---

9          Because the Rallos disbursed funds to RJB to pay RJB as requested in the Draws, there is no "double recovery" on the part of the Rallos for damages for both the preferential payments made by RJB to itself, and for amounts drawn by RJB for payments to subcontractors and materials suppliers but which RJB did not actually pay over.

retainage by showing that it was paid to the subcontractors, held in trust, or subject to a set-off.

In sum, the evidence shows that $36,550.03 remains unpaid to subcontractors and materials suppliers on Draws 1-14. From the evidence the court can conclude that of this amount, only the $1,742 withheld from Range West ($1,742) and the $3,736.14 withheld from Orr Concrete fall within the safe harbor of subsection 38-22-127(2), C.R.S., or were properly withheld under the Contract in relation to the foundation wall. After deducting these amounts, the court finds that RJB failed to disburse $31,071.89 to subcontractors and materials suppliers and which RJB received from the Rallos on Draws 1-14 in of the Trust Fund Statute. The court however, declines to impose Trust Fund Statute liability for unpaid subcontractors and materials suppliers in relation to Draws 15, 16 and 17 because there is insufficient evidence to establish that the Rallos disbursed funds to RJB for such amounts which is a necessary predicate to any liability under the Trust Fund Statute.

### d. Earmarked Funds Not Paid into Project

The accounting evidence also demonstrates that $135,946.48 of the amounts RJB claims were paid to subcontractors and materials suppliers on the Project were not paid into the Project and cannot be accounted by RJB. As discussed above, Exhibit 99 reflects the summary findings of Mr. Rallo's "audit" of RJB's records. Upon close examination, many of the invoices, payments, and lien waivers simply do not "tie out."

It is undisputed that the Rallos paid Draws 1-14 in full.[10] In Exhibit 99, the column titled "Amounts not Paid to Sub-Contractors" shows an additional $71,426.76 was not paid to subcontractors for Draws 1-14 after Mr. Rallo's reconciliation of the supporting documents described above. This amount is not duplicative of the amounts RJB indicates were not paid to subcontractors in Exhibit II.[11] Put another way, there are $71,426.76 in earmarked funds that were not paid by RJB as disbursed on Draws 1-14. Beginning with Draw 15 the accounting becomes more complex, but RJB's records

---

[10]     The court leaves Draw 15 out of this analysis because it is undisputed that the Rallos did not pay Draw 15 in full.
[11]     The column marked "Due to Subcontractor" is found on the far right side of Exhibit II.

purport to show payment of an additional $52,519.72 to subcontractors and suppliers from funds received paid to RJB by the Rallos. On closer examination, the supporting documents submitted by RJB again do not "tie out," leaving the court to conclude that RJB cannot account for another $52,519.72 which it claims to have paid into the Project. There is also an additional $12,000 in improperly drawn and disbursed funds, and a double-counting error in RJB's Draw 17 accounting in the amount of $1,916.14. As summarized in Subsection d.x. below, RJB is unable to show payment into the Project of the total sum of 137,862.62 in funds disbursed to it by the Rallos.

###### i.   Specific Discrepancies and Corroborative Evidence

In support of the court's conclusions in the preceding paragraph, and particularly with respect to the earmarking, the court finds it important to review several of the specific items in the context of the testimony at trial. This compendium of examples is not intended to be comprehensive, but rather illustrative of the myriad deficiencies in RJB's accounting. The court relies on the totality of the evidence is reaching its findings and conclusions.

Returning to the parties' spreadsheets, Exhibit II contains a column titled "PAYMENT DOCS" that lists the documents that RJB offered in support of its payments to various subcontractors and/or suppliers. These supporting documents were offered into evidence at trial (along with all of the other supporting documentation noted previously), and have been reviewed in detail by the court. In turn, Exhibit 99 contains three columns with the following headings "Amounts not Paid to Sub-Contractors", "Sub Contractor", and "Proof/Description" which summarize Mr. Rallos' conclusions with respect to deficiencies in the support concerning several subcontractors and suppliers. The court finds Mr. Rallo's conclusions persuasive as they are further corroborated by the testimony of several witnesses as summarized, at least in part, below.

ii.     **Mountain Painting and High Country Builders**

There are several discrepancies in the supporting documents relating to claimed payments to subcontractors High Country Builders ("HCB") and Mountain Painting Company ("MPC"). *See* Ex. 99.  For example, RJB claims it paid $1,311.00 to MPC on Draw 6 and provided in support thereof a lien waiver in that amount. The lien waiver references Check #1602.  However, check #1602 is for only $1,000.50.  The Rallos paid the entire $1,311 to RJB, leaving a discrepancy of $310.50.  RJB cannot adequately explain the difference.  Similarly, RJB claims to have paid $20,000.00 to HCB on Draw 6 and provided in partial support thereof a lien waiver in the amount of $1,272.00. The lien waiver references Check #1595. However, that check is for only $1,200.00, leaving a discrepancy of $72.  RJB also provided in partial support thereof a lien waiver in the amount of $5,319.50, which references Check #1592. However, that check is for only $5,000.00, leaving a discrepancy of $319.50.  There are several other similar instances relating to MPC.

Marrand Barrientez attempted to explain these discrepancies by claiming that RJB paid workers' compensation benefits on behalf of these subcontractors.  There is no documentary support for this assertion and no record of any such payment in evidence. Marrand Barrientez admitted that payment of workers' compensation benefits is not an allowable Cost of Work under the Contract and the Cost Control Estimate allocates no expense to the line item for "Workman's Compensation" (Ex. J3, at 2).  Further, it was admitted trial that HCB's subcontract (Ex. 77, at 300) expressly requires HCB to maintain its own workers' compensation insurance.  Marrand Barrientez testified that there was no written subcontract between RJB and MPC, but that there was an oral agreement with MPC to pay its workers' compensation.  In light of all of the foregoing, the court finds this testimony and explanation unbelievable and does not credit any payments supposedly made for workers' compensation relating to MPC or HCB.

Additionally, RJB claims to have paid $9,146.00 to MPC on Draw 11 and provided in support thereof a lien waiver in that amount. The lien waiver references Check #1788.  However, RJBs' bank records reflect that the check never cleared.  RJB

collected $9,146 from the Rallos for this invoice but it was clearly not disbursed as represented in the draws.

### iii.     Lone Eagle

Lone Eagle Enterprises is a subcontractor performing roofing, masonry, and stone work, and owned by Javier Mendoza.  Mr. Mendoza's deposition was admitted into evidence at trial by stipulation because he was unavailable as the result of his incarceration.  According to Mr. Mendoza's testimony, there were subcontracts between RJB and Lone Eagle for roofing ($45,000), and stonework/masonry ($95,000).   During the time of construction of the Rallo residence, Lone Eagle was also working on another project known as the "Miller Residence" for RJB.  The evidence is that two different invoices payable to Lone Eagle for $12,000 were generated, one for the "Miller Residence" which Mendoza authenticated at deposition, and another for the "Rallo Residence" that was included in the trial exhibit for Draw 7. Ex.  Mendoza testified that he did not prepare any of Lone Eagle's invoices for the Project and that he did not review any invoices submitted to the Rallos by RJB.

RJB claims it paid $12,000 to Lone Eagle on Draw 7 for work performed on the Rallo residence.  RJB's explanations relating to Lone Eagle lack credibility and the court finds that RJB incorrectly invoiced and was paid $12,000 by the Rallos for work performed on the Miller Residence.  As such, the $12,000 was not paid into the Project.

Additionally, RJB claims it paid $18,000 to Lone Eagle Enterprises on Draw 10, but the lien waivers and checks total only $16,542.60, leaving an unexplained discrepancy of $1,547.40.   RJB also claims to have paid Lone Eagle $2,162.96 and $9,386.04 on Draw 13 and $5,100 on Draw 14.  In support of these items, the RJB asserts that it "backcharged" Lone Eagle Enterprises. RJB has not offered any satisfactory explanation for the actual disposition of the funds paid by the Rallos.  If the funds were "backcharged" to Lone Eagle for some deficiency in its work, the charge would not be a recoverable Cost of Work payable by the Rallos. See Ex. J1, Article 04.B.7

Page **32** of **75**

### iv.     Frank Paxton Lumber

RJB claims it paid $16,500.00 to Frank Paxton Lumber on Draw 8.   RJB acknowledges in pretrial discovery responses (Ex. 100) that it issued checks to Western Millwork rather than Frank Paxton Lumber and that the support totals $15,986.96 rather than $16,500.00, a discrepancy of leaving $513.04 which RJB cannot prove was paid into the Project.

### v.     HCB Double Billing

RJB claims it paid $22,000.00 to High Country Builders on Draw 4 and $10,000.00 to High Country Builders on Draw 9.  However, RJB references the same support for both payments. In short, RJB double billed the Rallos $10,000 on Draw 9.

### vi.     All Flooring Design

RJB claims it paid $757.88 to All Flooring Design on Draw 10, but provides no support for this payment.

### vii.     Luxury Stone

RJB claims it paid $20,000 to Luxury Stone on Draw 11 and provides in partial support a lien waiver in the amount of $16,586.42.  The lien waiver references Check #1804.  However, that check is for only $5,000.00.  RJB has failed to carry its burden to show that the balance of $11,856.42 was paid into the Project.

### viii.     Umverto Munoz Gutierrez and Bernobe Verdugo

RJB invoiced the Rallos $7,350 on Draw 14 for glass shower doors provided by a subcontractor identified as Umverto Munoz Gutierrez $7,350.00. Ex. J17.  The Rallos disbursed $7,350 to RJB as requested.  According to Exhibit II, RJB only paid Mr. Gutierrez $5,869.63 toward this $7,350.  Exhibit II lists in support of this payment two checks, for $2,225 and $1,283.05 respectively, totaling $3,508.05. The checks are supported by lien waivers purportedly signed by Mr. Gutierrez. Ex. J26. While not listed by RJB in Exhibit II, Mr. Rallo's reconciliation determined that the difference between the $3,508.05 supported by checks and lien waivers and the $5,869.63 which RJB claimed to be paid was a credit card payment in the amount of $2,361.13 found in Exhibit MM.  One may infer that the difference was for materials, but there was no

corroborative evidence in that RJB never satisfactorily explained why it submitted a Draw for one amount and then purportedly paid a different amount to the subcontractor. Indeed, RJB never explained the payment of the very particular sum of $5,869.63. This item is illustrative that it is practically impossible to follow RJB's accounting and contributes to the court's conclusion that at anything other than a superficial level, RJB's accounting is disorganized, lacking in transparency, and unreliable.

At trial, and in effort to clarify this particular issue, the Rallos called a witness believing him to be Mr. Gutierrez. In fact, the individual identified himself as Bernobe Verdugo. With the assistance of the court's interpreter, Mr. Verdugo went on to testify that he drove to Colorado from Mexico specifically to testify in the trial and that he had prepared original drawings of the doors attached to Draw 14, that he had agreed to manufacture and install the doors for a total of $10,700, not $14,700, and that he did the work (excepting a portion later completed by another subcontractor). He further testified that when he approached Mr. Rallo for payment, he provided Mr. Rallo with a copy of the drawing (Exhibit 97, pages 81 and 83) that differs somewhat from that contained in Draw 14. Specifically, it has the $14,700 crossed out and $10,700 written in its place. This document also bears Mr. Verdugo's name instead of that of Mr. Gutierrez. Mr. Verdugo further testified that RJB paid him nothing for the work and that the only money he received was $2,900 that Mr. Rallo paid him directly well after RJB left the Project. Mr. Rallo's payments are supported by lien waivers signed by Mr. Verdugo (Exhibit 97, pages 79 and 82). Mr. Verdugo indicated that he had never seen any of the checks, lien waivers or credit card payments provided by RJB. He testified that he does not accept credit cards and so could not have been paid in that manner. Mr. Verdugo testified that he is not one and the same as Mr. Gutierrez and he does not know Mr. Gutierrez.

In summary, RJB submitted a Draw to the Rallos for $7,350 on a subcontract that was supposedly for $14,700 payable to Mr. Gutierrez and claim to have paid $5,869.63 to Mr. Gutierrez in the form of two checks and a credit card payment (such credit card

payment not even listed on their own accounting), but it turns out the contract was really for $10,700, that the work was done by Mr. Verdugo rather than Mr. Gutierrez, and that RJB never paid Mr. Verdugo anything for the work.

Marrand Barrientez was asked at trial for his response to Mr. Verdugo's testimony. He claimed that Mr. Gutierrez is Mr. Verdugo's cousin, that Mr. Gutierrez introduced RJB to Mr. Verdugo, and that Gutierrez and Verdugo did the work on the shower doors together. The court is unconvinced. RJB did not confront Mr. Verdugo with Marrand Barrientez's version of the facts during cross-examination and did not produce Mr. Gutierrez as a rebuttal witness (even with the delay in trial time in March). Regardless, it remained uncontested that the contract price was $10,700 and even if RJB's explanation was accepted, RJB did not offer any explanation as to why checks and credit card payments were not made out jointly to Mr. Verdugo, or why he signed no lien waivers despite having performed at least some of the work.

The court weighs the testimony and finds Mr. Verdugo to be more credible than Marrand Barrientez on this matter, particularly when considering the numerous other accounting discrepancies attributable to RJB. Indeed the court generally finds the testimony of the subcontractors to be more believable than that offered by RJB based on the demonstrable and repeated errors in RJB's accounting.

### ix. Lilly's Lighting & Decor

RJB submitted two requests to the Rallos for payment of Lilly's Lighting & Décor for the amount of $7,181.00. The first was on Draw 11 and was disbursed by the Rallos and paid by RJB. *See* Ex. II. The second, also for $7,181.00, was on Draw 15. RJB's accounting, Ex. II, reflects that the Rallos disbursed and RJB paid Lilly's $7,181 on Draw 11. The source documents, however, reflect that RJB offered the same support (a lien waiver and Check #1795 in the amount of $7,181.00) on both draws. Denise Roberts, the principal of Lilly's Lighting & Décor, testified only $7,181 was received. RJB has failed to carry its burden to show that the second $7,181 paid to it by the Rallos was paid into the Project.

Page 35 of 75

x.      **Summary of Amounts Unaccounted for by RJB**

Based upon the foregoing, the court finds that the Rallos disbursed $123,946.48 to RJB on the Project for labor or materials furnished by subcontractors and/or materials suppliers, but RJB has failed to meet its burden of proof to show that such amounts were actually paid to into the Project.  There is also evidence of an additional $12,000 paid by the Rallos for Lone Eagle that was improperly diverted to a different project, and RJB's own accounting double counted its claimed payments into the Project on Draw 17, resulting in an additional $1,916.14 in unaccounted for disbursements. Accordingly, the Court finds that RJB failed to meet its burden to show the total sum of $137,862.62 was paid into the Project from the funds requested of and paid to it by the Rallos.

e.      **Violation of Trust Fund - Conclusion and Damages**

The Rallos have asserted related claims for violation of the Trust Fund Statute and civil theft, and also conversion. *See* Amended Complaint, Third Claim for Relief (Violation of Trust Fund Statute and Civil Theft) and Fourth Claim for Relief (Conversion), ¶¶ 66-79.  The evidence is that the Rallos' actual damages are identical for both claims.  Subsection 5 of the Trust Fund Statute provides that "[a]ny person who violates the provisions of subsections (1) and (2) of this section commits theft, as defined in section 18-4-401, C.R.S." C.R.S. § 38-22-127(5) (2015).   Pursuant to C.R.S. § 18-4-405, the Rallos are entitled to damages in the amount of three times the amount of actual damages, together with their attorney's fees and costs.

Conversion is "'any distinct, unauthorized act of dominion or ownership exercised by one person over personal properly belonging to another.'" Rhino Fund, LLLP v. Hutchins, 215 P.3d 1186, 1195 (Colo.App. 2008) *quoting* Glenn Arms Assocs. v. Century Mortgage & Inv. Corp., 680 P.2d 1315, 1317 (Colo.App. 1984).  An action for conversion of money will lie where there is an obligation to particularly treat specific money. Id.   In light of the court's findings and conclusions with respect to violation of

the Trust Fund Statute, the court finds that the Rallos have also proved by a preponderance of the evidence their claim for conversion against RJB.

The Rallos' claims for violation of the Trust Fund Statute and Conversion are also asserted against Randy Barrientez personally.  It is well established that a corporate officer is personally responsible for the knowing diversion of funds under both the Trust Fund Statute and the tort of conversion. *See* <u>Alexander Co. v. Packard</u>, 754 P.2d 780, 782 (Colo.App. 1988) (recognizing that corporate officer personally liable for breach of Trust Fund Statute even where no evidence of personal benefit); <u>Flooring Design Associates, Inc. v. Novick</u>, 923 P.2d 216, 221 (Colo. App. 1995) (diversion of trust funds to other corporate obligations results in personal liability).  <u>Standley v. American Auto. Ins. Co.</u>, 136 Colo. 70, 314 P.2d 969 (1957) (officers of corporation personal liable for conversion by diverting funds from their intended purpose).   Here, the evidence is that Randy Barrientez is the president of RJB, that he negotiated and personally guaranteed the Contract, and that he was primarily responsible for all of the financial and other business decisions made by RJB throughout the course of the Project.  As such, the court finds sufficient evidence to find Randy Barrientez personally liable on the Rallos claims for violation of the Trust Fund Statute and civil conversion.

Based upon all of the foregoing, the court finds and concludes as a matter of law that RJB violated the Trust Fund Statute causing actual damages to the Rallos, and that RJB has converted the Rallos funds disbursed to it on the Project, and that the Rallos are therefore entitled to judgment in their favor and jointly and severally against RJB and Randy Barrientez on their claims for violation of the Trust Fund Statute and Conversion.  The court finds the Rallos sustained actual damages in the following amounts:

     (i)     RJB used trust funds to pay itself in preference to subcontractors and/or material suppliers causing actual damages in the in the amount of $30,061,58 (Section IV.C.3.b. *supra*);

     (ii)     RJB failed to pay trust funds as they were earmarked according to the Draws leaving subcontractors and suppliers unpaid and causing actual damages in the amount of $31,071.89 (Section IV.C.3.c. *supra*); and

(iii)    RJB failed to establish that $137,062.62 in trust funds disbursed to it by the Rallos were paid in the Project causing actual damages in the amount of $137,062.62 (Section IV.C.3.d. *supra*).

Pursuant to C.R.S. § 18-4-405, the Rallos are entitled to an award of damages in an amount equal to three times their actual damages, for a total of $650,272.02, together with their reasonable attorney's fees and costs for violation of the Trust Fund Statute. The Rallos are also entitled to judgment in the principal amount of $216,757.34 on their claim for conversion, but this amount is subsumed by the damages awarded for violation of the Trust Fund Statute and the Rallos are entitled only to a single judgment for the same damages.

### D.    Breach of Contract

RJB and the Rallos each claim the other breached the Contract.  RJB contends that the Rallos unilaterally terminated RJB without cause in a phone call between Mr. Rallo and Randy Barrientez on January 30, 2015, approximately five weeks after the Certificate of Occupancy was obtained.  The Rallos argue that RJB failed to deliver the Project on time, abandoned the Project after the Rallos refused to pay amounts in excess of the GMP, and failed to address defective workmanship.  Resolution of these competing claims centers on disputed issues of fact concerning change orders and the time for completion as there is no question completion was late and that the purported cost was in excess of the GMP.

#### 1.    December of 2015

Putting aside temporarily the court's findings of fact and conclusions of law with respect to the Trust Fund Statute, the court turns to an examination of the events and circumstances during the last few weeks of 2014 and early 2015.

Draws 1 – 14 were submitted by RJB and paid in full.  Draw 14 was submitted toward the end of November, 2014.  The Payment and Draw Summary submitted as part of Draw 14 reflects that through the course of the Project at that time, the original GMP of $2,127,520.00 had been increased to account for changes in the work in the

amount of $14,521.64, for a revised GMP of $2,142,041.64. *See* Ex. J17, at RJB001342.  The Payment and Draw Summary also reflects that RJB had drawn $1,928,348.30 through Draw 14 and was 91% drawn against the Cost Control Estimate, leaving $184,632.60 available for completion.  The Rallos paid the Draws 1-14 timely and in full as requested during the course of the Project.

By Thanksgiving of 2014, Mr. Rallo had grown increasingly impatient with RJB in relation to the delay in completion of construction.  Draws 1 -14 included Change Orders 1 – 12.  Each Change Order includes a document entitled "Change of Scope" which includes a provision for "Impact to Contract" with subcategories for "Work", "Schedule", and "Cost".  The term "Schedule" includes the following description "(Date of substantial completion set forth in the existing contract is hereby extended as described above)". *See* Ex. J21 (CO1, RJB001931).   Only two of the Change Orders 1-12, Change Order 1 and Change Order 6, adjusted the "Schedule" to extend the Contract Time.  Change Order 1 increased the time by 4 days, and Change Order 6 increased the time by 2 days. *See* Ex. J21 (CO1, 4 days, CO6, 2 days).   Thus, the information available to Mr. Rallo from Draws 1-14 at the end of November reflected that the Project was substantially behind schedule, that only 6 days of time had been authorized by Change Order, and that 9% of the GMP remained to disburse for completion.  Mr. Rallo made clear to RJB in November that a certificate of occupancy had to be obtained prior to Christmas so that Mr. Rallo could make use of the home over the holiday.

RJB obtained a Certificate of Occupancy from the Town of Breckenridge December 22, 2014.  The following day RJB submitted Draw 15 to Mr. Rallo requesting payment for $127,139.23.  / Mr. Rallo had previously paid $15,968 of this amount directly to the Town of Breckenridge at RJB's request.  Mr. Rallo paid RJB an additional $29,395.77 on December 24, 2014, and $20,000 January 19, 2015, for a total of $65,363.77. The Rallos did not pay to RJB the remainder of Draw 15, $61,775.46.  Draw 15 did not operate to change the GMP (as adjusted previously to $2,142,041.64), and did not increase the Contract Time. At the time of the January 19, 2015 payment, the Rallos had paid $1,994,384.16 to or as directed by RJB on the Project.  The Certificate of Occupancy

was obtained seven months after the date for substantial completion required by the Contract. Mr. Rallo withheld the remainder of Draw 15 because RJB had not provided the $10,000 monthly credit as required by the Contract, had delivered the house seven months late, and had failed to remedy alleged known defects in the house. *See* Complaint, filed December 22, 2014.

After Mr. Rallo left following the holidays, RJB resumed work on the Project in late January and submitted Draw 16 around January 23, 2015, for $26,092.98. [12] A punch list was developed between RJB and Mr. Rallo. RJB contends that Rallo unilaterally terminated RJB without cause on January 30, 2018. Rallo contends that RJB walked off the job and refused to continue work without additional payment. RJB compiled and submitted Draw 17 for $18,549.24 on February 2, 2015, along with a change order package containing Change Orders 13-43 requesting an additional $126,889.94 to be added to the Contract Sum and GMP for claimed changes in the scope of the work, and for an increase in the Contract Time of 131 week days.

In early February there was lengthy telephone call between Mr. Rallo and Randy Barrientez during which the punch list, the thirty additional change orders, and the delay in the Project were discussed, along with other issues. Among other concerns, Mr. Rallo by that time had been approached by several subcontractors and materials suppliers demanding payment. Mr. Rallo offered to pay RJB $62,000 to complete the Project, including the punch list and sent a check to RJB for that amount. Mr. Rallo later stopped payment on the check, citing RJB's refusal to perform as agreed. RJB performed some minor additional work in February. Mr. Rallo paid several subcontractors and suppliers directly. The remaining work on the Project was completed by subcontractors working directly for Mr. Rallo.

The parties' respective claims for breach of contract boil down to substantial performance. In order to resolve that question, the court must consider RJB's claimed

---

[12]     As noted previously, RJB was unable to locate the support documentation for Draw 16 during the discovery period. Interestingly, Draw 15 reflected $29,060.75 in retainage held and Draw 16 reflects no remaining retainage, implying payment.

change orders both with respect to the additional claimed costs as well as justification for the delay in substantial completion.

2.      **Change Orders**

RJB submitted a total of forty-three Change Orders to the Rallos relating to the Project, all as contained in Exhibit J21.  It is undisputed that Change Orders 1-12 were submitted with Draws 1-14 and paid in full by the Rallos.  Change Orders 13-43 were not submitted to the Rallos until February 6, 2015.  RJB then submitted a revised version of Change Orders 13-43 to the Rallos on March 9, 2015.  The timing of the submission of Change Orders 13-43 is contrary to the express terms of the Contract.  The Contract provides that "[RJB] shall make all claims to [the Rallos] for additional cost, extensions of time . . . . at the time such claims are identified and in accordance with the Contract Documents." Ex. J2, Article 05.  RJB followed the process required by the Contract on the first twelve Change Orders, all of which were approved and paid in full by the Rallos.  Change Orders 13-43 include claims which span nearly the entire duration of the Project and were not submitted "at the time such claims [were] identified." Id. RJB's explanation for the delay in submitting Change Orders 13-43 was that Mr. Rallo told them to hold all of the Change Orders until the end of the Project.  Randy Barrientez expanded on this idea by explaining that he felt bad about the foundation wall error and was attempting to make it right with the Rallos.  The evidence also implies that Mr. Rallo and Mr. Barrientez were engaged in a collusive effort to obtain $100,000+ from RJB's insurer for costs relating to the foundation wall to create an offset for extra work on the Project requested by the Rallos.  Included in the evidence is a proposed draft email to RJB's insurance adjuster which was prepared by Randy Barrientez and sent to Mr. Rallo in July, 2014. See Ex. Rallo 30.  The draft contains a vastly inflated cost of repair[13] and the completely unfounded assertion that the repairs

---

[13]      The accounting records introduced into evidence at trial indicate that many of the costs identified in the draft email were never incurred and that those costs actually incurred were substantially less (e.g. plumbing costs were less than $5,000, not $15,000).

resulted in a delay to the project of 3½ months.[14]   The draft claims a total cost of $122,500 (which includes $35,000 in penalties for the schedule overrun), for the foundation error.   The upshot of this evidence is that it lends some credence to Randy Barrientez's explanation that some changes were being held based on the idea that RJB would submit an insurance claim and then Rallo could use the funds to offset "extras" on the Project.   This scheme did not, however, play out as there is no evidence that the email was ever sent, much less any evidence that RJB obtained any insurance funds during the course of the Project. Regardless, the court ultimately rejects RJB's explanation because it is inconsistent with RJB's submission of Change Orders 1-12 which include work performed as late as November, 2014 and which were submitted contemporaneous to the change in the Project's scope as required by the Contract.   It is also contradicted by the email exchange between Mr. Rallo and Randy Barrientez in March and April, 2014, wherein a number of changes were discussed and some agreements were purportedly reached. *See* Ex. 38.   The evidence is that as the predicating changes to the scope of work occurred, RJB had all of the necessary information to make claims for extra cost and time.[15] And, RJB was aware of the terms of the Contract, including both the GMP and the delay penalty.   There is no justification for the RJB's delay in submission of the Change Orders, other than mismanagement of the Project.   Accordingly, the court finds that RJB waived its right to claim the additional costs and time contained in Change Orders 13-43.   Even if the court accepted RJB's position that Change Orders 13-43 were delayed at the request of Mr. Rallo, the

---

[14]    RJB prepared a schedule in January, well after the foundation error was discovered and the Rallos and RJB had agreed upon and implemented remedial measures to avoid the time and expense associated with removal and reconstruction of the wall, which reflects no delay for anything other than the groundwater mitigation that occurred in July and August.  Furthermore, many of the remedial measures involved modifications to framing that would be constructed in any event and merely required adjustments (e.g. furring out the concrete foundation wall would have occurred per the Plans even if the wall was not out of square).

[15]    Exhibit 38 is instructive in this respect to the extent it establishes Randy Barrientez's knowledge of claimed changes in the scope of work nearly a year before Change Orders 13-43 were prepared and submitted, and that he knew RJB had a basis to request an increase in the Contract Time.  Indeed, in Exhibit 33 Randy Barrientez expresses his intent to update the Project schedule after completion of rough-ins, but no additional updated schedule was ever offered into evidence.

evidence is insufficient to validate the requested increase in the Contract Price and extension of Contract Time.

### 3.     Insufficient Evidence of Agreement

In an effort to avoid waiver, RJB claims that Mr. Rallo approved Change Orders 13-43 subject to certain adjustments during a phone call with Randy Barrientez in February, 2015, and that the revised package of Change Orders submitted in March, 2015, reflects the agreed upon version of Change Orders 13-43.  The court is not persuaded.

There is no question that there was a lengthy phone call at which the newly requested Change Orders were discussed.  It is, however, important to note that the Rallos had already served RJB with the complaint in this matter which squarely alleges that RJB had exceeded the GMP, failed to provide delay credits to the Rallos, and identified several claimed construction defects.   All of these allegations were raised before RJB submitted any version of Change Orders 13-43.   Moreover, Mr. Rallo was confronted with the task of completing the Project from afar, as well as addressing the growing list of subcontractors and materials suppliers demanding payment and claiming they had not been paid by RJB.  And, Mr. Rallo had no understanding of the accounting deficiencies in the Project, most of which were revealed only during the discovery process in this case.   There are notes which purport to reflect agreements on certain changer orders, as well as the revised set of change orders produced on or around March 9, 2015, and both parties clearly wanted to find a way forward.  That said, while the court is convinced that the call occurred, the evidence is insufficient to establish a meeting of the minds between Randy Barrientez and Mr. Rallo concerning the change orders and there is little evidence of any performance that would tend to corroborate such an agreement.   Even if the court could overcome the absence of an agreement, the Change Orders 13-43 have many other significant flaws which undermine their validity.